NOTICE
Decision filed 06/05/19. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2019 IL App (5th) 170295

NO. 5-17-0295

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DONALD R. HAMILTON JR., | ) | Monroe County. |
| | ) | |
|     Petitioner-Appellee and Cross-Appellant, | ) | |
| | ) | No. 13-D-13 |
| and | ) | |
| | ) | |
| MARY L. HAMILTON, | ) | Honorable |
| | ) | Dennis B. Doyle, |
|     Respondent-Appellant and Cross-Appellee. | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    Both parties appeal portions of the judgment dissolving their marriage. The respondent, Mary L. Hamilton, argues that (1) the court erred in failing to consider the parties' daughter's activities involving horses as extracurricular activities, (2) the court abused its discretion in ordering the marital home to be sold, (3) the court erred in failing to assign all of the marital debt, (4) the court erred in finding that Mary failed to make a *prima facie* showing of dissipation, (5) the court erred in failing to award Mary a portion of two retirement accounts liquidated by the petitioner, Donald R. Hamilton Jr. (Don), and (6) the court abused its discretion in denying her request for attorney fees. Don argues that (1) the court abused its discretion in awarding permanent maintenance to Mary and (2) the court abused its discretion in ordering him to pay

half of his daughter's private school tuition. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     The parties were married in 1988. They raised three children together: Mary's son from a previous marriage, Tom, and two children born to the parties during their marriage, Donny and Katelyn. When the parties were first married, both worked outside the home, and Mary took college classes. Mary worked for the City of Red Bud as an administrative assistant. Later, however, she took a job in St. Louis. Her employer there paid her tuition. Mary earned an associate's degree and continued to take classes toward a bachelor's degree. At some point, however, the parties decided that Mary should take a job closer to Red Bud, where both Tom and Donny attended school. Mary did so. She stopped taking classes, partly because she no longer had an employer paying her tuition and partly because it gave her more time to devote to her two sons. She never completed her degree.

¶ 4     Katelyn, the only child who was still a minor when these proceedings took place, was born in 2000. When she was a year old, the parties agreed that Mary would stop working outside the home and be a stay-at-home mother. Mary did not work outside the home from 2001 until after the parties separated. She did not work full-time until 2014, when she began working as a grant writer for the Lutheran Synod Missouri.

¶ 5     In 2010, the parties purchased two horses for Katelyn. There is no dispute that the parties made a joint decision to buy Katelyn her first horse, Star. Later that year, they bought a second horse, Chloe. According to Mary, they agreed to buy a second horse so that Katelyn, who was only 10 years old at the time, could have an adult ride with her. According to Don, the parties discussed buying a second horse for Katelyn because Star was an older horse and Katelyn's

equestrian skills would likely improve. He claimed, however, that Mary made the ultimate decision to purchase Chloe before they came to an agreement.

¶ 6    The parties owned two pieces of real estate—their marital home and a rental house located on an adjoining property. The tenant in the rental home paid monthly rent of $625.

¶ 7    Don moved out of the marital home in November 2010, but did not immediately file a petition for dissolution. He moved back into the marital home in the summer of 2012, but left again three months later. He did not file a petition for dissolution until February 2013.

¶ 8    During the period the parties were separated, Mary worked at various temporary jobs, although it is not clear how much time she actually worked. She also applied for permanent jobs with no success. In the fall of 2011, the parties agreed that Mary would home-school Katelyn, who was then going into sixth grade. As mentioned earlier, Mary began working in a full-time position as a grant writer in June 2014. In the fall of 2014, Katelyn enrolled at Lutheran High School South, a private school in Missouri near Mary's workplace.

¶ 9    The procedural history of this case is long and complicated. Don filed a petition for dissolution in February 2013. In July 2013, Mary filed a counterpetition for legal separation and motions requesting temporary child support, temporary maintenance, and an award of interim attorney fees. In December 2013, the court ordered Don to pay child support of $971 per month and to pay certain debts owed by the parties, including overdue mortgage payments and property taxes. The court denied Mary's requests for temporary maintenance and interim attorney fees, but it provided that Mary was to retain all of the income from the rental house.

¶ 10    In July 2014, Mary filed a petition for civil contempt, alleging that Don failed to make the mortgage and property tax payments as ordered. The court found Don in contempt and ordered him to make the payments, totaling $14,003.11. In October 2014, Don indicated that he was in the process of withdrawing funds from his retirement accounts in an effort to comply with

the court's order. Mary filed a motion to deposit funds. She alleged that she received documents from Don requesting her signature so that he could withdraw a total of $21,150.38 from two retirement accounts, which exceeded the debt Don was ordered to pay by $7147.27. She asked the court to order Don to deposit the excess funds into the trust account of either party's attorney in order to protect her marital interest in the funds. The court granted the motion, but Don never deposited the funds.

¶ 11    The matter first came for a trial on all issues in April 2015. However, after the hearing, the matter was continued for nearly a year to allow the parties to complete further discovery. During this period, Mary filed various motions to compel discovery and motions for sanctions. Don also filed at least one motion for sanctions against Mary. The court ordered Don to pay $400 of Mary's attorney fees, but otherwise denied all motions for sanctions. Temporary child support was raised to $1435 per month in January 2016 due to an increase in Don's income. The parties finally completed discovery in March 2016, and the court held two additional hearings in March and July 2016.

¶ 12    Evidence presented at the three hearings showed that Mary's gross income from her job was $4119 per month. Don had a base salary of $4000 per month, but he also earned commissions. His income from commissions fluctuated. The evidence Don presented to the court showed that he had a gross monthly income of $5258 in 2014 and a gross monthly income of $11,185 in 2015. Don testified, however, that the 2015 figure included a signing bonus from his new job. We will discuss other relevant evidence, along with our discussion of the numerous issues the parties raise.

¶ 13    The trial court entered a judgment dissolving the parties' marriage in May 2017. The court incorporated Mary's proposed parenting plan, which gave Mary the majority of parenting time with Katelyn and all decision-making responsibility. The court ordered Don to pay child

- 4 -

support and permanent maintenance. In calculating the amount of maintenance, the court found that Don's gross monthly income was $8221, a figure derived from the average of the two years for which he provided income information. In addition to child support, the court ordered Don to pay half of Katelyn's education expenses, but it found that the activities related to Katelyn's interest in horses did not constitute extracurricular activities, and it did not order Don to contribute to the expenses for those activities. The court divided the parties' vehicles and personal property pursuant to the parties' agreement. It awarded both parties their own retirement accounts. It ordered the parties to sell the two pieces of real estate and divide the proceeds after paying any remaining debt. The court divided some of the parties' debts, but Mary contends that it did not divide all of their debts. The court denied Mary's request for attorney fees and rejected her claim of dissipation.

¶ 14    Both parties filed motions to reconsider, which the court denied. Both parties then filed timely notices of appeal.

¶ 15                                II. ANALYSIS

¶ 16                A. Expenses for Katelyn's Horses and Related Activities

¶ 17    Mary first argues that the court erred in finding that the expenses related to Katelyn's interest in horses did not constitute expenses for extracurricular activities. She acknowledges that whether to order a parent to pay a portion of a child's extracurricular activity expenses is a matter within the discretion of the trial court. She argues, however, that the court did not exercise this discretion due to its erroneous conclusion that Katelyn's horse-related activities were not extracurricular activities. We agree.

¶ 18    At trial, Mary, Katelyn, and Don all testified about Katelyn's interest in horses. When Katelyn began her testimony, the court asked Mary's attorney about the relevance of his questions about Katelyn's horses. Counsel explained that Mary was requesting that Don be

ordered to pay for half of Katelyn's extracurricular activity expenses. The court asked, "Is it related to school in some way?" Counsel responded, "I don't want to say her scholastic school, no, but it's related to a very big part of her life ***." When Mary testified about Katelyn's activities at a subsequent hearing, the court stated, "I would define extracurricular activities as something to do with education but not being on the curriculum. So hobbies I don't think would be included ***."

¶ 19    Katelyn was a 15-year-old high school freshman when she testified at the April 2015 hearing. She testified that she hoped to become an equine veterinarian. To that end, she was involved in hippology, which is the study of all things related to horses. Katelyn took riding lessons and participated in horse camps and drill teams even before her parents bought Star and Chloe for her. Katelyn testified that she and Mary helped care for her horses, which reduced the cost of stabling them somewhat.

¶ 20    At a subsequent hearing, Mary testified that Katelyn participated in a hippology program through the 4-H program. She explained that the 4-H program was run by the University of Illinois. Mary further testified that Katelyn competed in statewide competitions related to hippology. These included giving speeches on topics related to horses and participating in a "horse bowl," which is similar to a "scholar bowl." Mary was specifically asked how Katelyn's care for her own horses related to her interest in becoming an equine veterinarian. Mary explained that Katelyn helped care for the horses. She noted that when Star had a deep puncture wound, Katelyn helped the veterinarian by handling the tools used to suture his wound. She also noted that Katelyn massaged Star's wound as it healed, and she administered medication to Chloe. Both Mary and Katelyn acknowledged that Katelyn could participate in many horse-related activities without owning her own horses, and Katelyn acknowledged that she could "probably" volunteer to care for horses at a stable.

¶ 21 Even Don acknowledged the importance of horses and horse-related activities to Katelyn. He testified that Katelyn was attached to her horses, and that she was involved in multiple activities related to horses. He noted that he participated in some of these activities with her before the parties separated. Don was specifically asked about Katelyn's participation in extracurricular activities. He replied, "As far as I know, hippology, 4-H. I guess that—that school has a 4-H club. If not, she's doing the 4-H in Waterloo."

¶ 22 Mary argues that the court incorrectly defined "extracurricular activities" to include only those activities that relate "specifically to Katelyn's education." She further argues that, even accepting the court's definition of extracurricular activities, Katelyn's horse-related activities fall within that definition. We agree.

¶ 23 Resolution of this question requires us to construe the pertinent statute. Our primary goal in statutory construction is to ascertain and effectuate the legislature's intent. The most reliable indicator of that intent is the language of the statute itself. *In re Marriage of Suriano*, 324 Ill. App. 3d 839, 846 (2001). If the statutory language is clear and unambiguous, we must enforce it as written without resort to additional aids of statutory construction. Because statutory construction is a question of law, our review is *de novo*. *Id.*

¶ 24 The version of the statute in effect when these proceedings took place provided that trial courts may, in their discretion, "order either or both parents *** to contribute to the following expenses, if determined by the court to be reasonable: (a) health needs not covered by insurance; (b) child care; (c) education; and (d) extracurricular activities." 750 ILCS 5/505(a)(2.5) (West 2014). The statute did not define "extracurricular activities."

¶ 25 Where there is no statutory definition for a term, it must be given its plain and ordinary meaning. *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008). As Mary notes in her brief, Merriam-Webster's Online Dictionary defines "extracurricular" as "not falling within the scope of a

- 7 -

regular curriculum" or "of or relating to officially or semiofficially approved and usually organized student activities (such as athletics) connected with school." See Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/extracurricular (last visited May 30, 2019) [https://perma.cc/U8BW-K86G]. As both parties note, however, other dictionaries define the term more broadly. For example, Dictionary.com defines the term "extracurricular" to mean "outside the regular curriculum or program of courses." See Dictionary.com, https://www.dictionary.com/browse/extracurricular (last visited May 30, 2019) [https://perma.cc/86YY-HTQ7]. Although these definitions are similar, they differ in one respect—the degree to which an activity must be connected with the participant's school. We will therefore look to other aids of statutory construction.

¶ 26    One such aid is subsequent statutory amendments, which may indicate that the legislature intended to clarify the law. See *In re Marriage of Blaisdell*, 142 Ill. App. 3d 1034, 1041 (1986). The version of the child support statute now in effect provides that a court may order a parent to contribute to "the reasonable school and extracurricular activity expenses incurred which are intended to enhance the educational, athletic, social, or cultural development of the child." 750 ILCS 5/505(a)(3.6) (West Supp. 2017). This language reveals a legislative intent to clarify that activities serving the specified purposes fall within the purview of "extracurricular activities" whether or not they are directly connected with a child's school. Because this statutory amendment was intended to clarify the existing statute, it may be applied in this case. See *Blaisdell*, 142 Ill. App. 3d at 1041.

¶ 27    We believe that Katelyn's horse-related activities fall within this definition. The activities are clearly intended to enhance Katelyn's educational development, as she pursues her goal of becoming an equine veterinarian. In particular, her participation in contests where she answers questions about hippology or gives speeches about horse-related topics is an activity that is

inherently educational in nature, even though it may not be directly related to her current school curriculum. Katelyn's riding activities are also clearly intended to enhance her athletic development. It is worth noting that the 4-H program Katelyn participates in is run through the University of Illinois.

¶ 28    We also note that Katelyn's activities are similar to the kinds of extracurricular activities courts have addressed in the past. See, *e.g.*, *In re Marriage of Sorokin*, 2017 IL App (2d) 160885, ¶ 11 (considering a parent's obligation to contribute to the cost of the children's tutoring, sports programs, clubs, and summer camps); *In re Marriage of Moorthy*, 2015 IL App (1st) 132077, ¶ 28 (considering a parent's obligation to pay for a child's classes in various sports, hobbies, and academic interests, some of which were offered by the child's school while others were offered elsewhere); *In re Marriage of Florence*, 260 Ill. App. 3d 116, 122 (1994) (addressing a parent's obligation to contribute to the cost of the child's volleyball, softball, swimming, and clarinet lessons). We find that the court erred in determining that Katelyn's horse-related activities were not extracurricular activities.

¶ 29    Don argues, however, that "regardless of the definition of the term extracurricular," we may uphold the court's ruling as a proper exercise of its discretion. We disagree.

¶ 30    As both parties point out, the decision to order a parent to contribute to expenses incurred for a child's extracurricular activities is a matter within the trial court's discretion. 750 ILCS 5/505(a)(2.5)(d) (West 2014). In addition, the court may only order a parent to contribute to expenses it finds to be reasonable. *Id.* Here, however, the court did not exercise its discretion at all because it incorrectly determined that Katelyn's activities involving horses were not extracurricular activities. For the same reason, the court did not consider whether any or all of the expenses related to these activities were reasonable.

¶ 31　Where, as here, a trial court fails to exercise its discretion due to an erroneous conclusion that it has no discretion, its decision must be reversed. *In re Marriage of Wisniewski*, 286 Ill. App. 3d 236, 243 (1997). We must therefore reverse the portion of the court's order finding that the activities related to Katelyn's interest in horses were not extracurricular activities. On remand, the court must determine whether all or some portion of those expenses are reasonable and whether, in the exercise of its discretion, Don should be ordered to contribute to those expenses.

¶ 32　　　　　　　　B. Valuation and Disposition of Real Estate

¶ 33　Mary next argues that the court erred in ordering the parties to sell the marital home and the rental house. The court ordered this disposition because it found that the parties did not present any competent evidence as to the value of the properties. Mary argues that the court erred in so finding because each of the parties presented evidence of value that was consistent with the evidence presented by the other party. That evidence consisted of Don's testimony as to what he believed the two properties were worth and tax assessment notices for the properties submitted by Mary. Mary further argues that the court abused its discretion in ordering the sale of the marital home because it had been in her family for over 90 years and because awarding the home to Mary, the custodial parent, would have been in Katelyn's best interest. We disagree.

¶ 34　Distribution of marital property is a matter within the discretion of the trial court. On appeal, we will not disturb the court's distribution of assets absent an abuse of that discretion. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 979 (1992). The distribution of assets must be equitable in nature. *Id.* Although equal distribution "is generally favored" (*In re Marriage of Minear*, 287 Ill. App. 3d 1073, 1083 (1997)), the division "need not be mathematically equal to be equitable" (*Tietz*, 238 Ill. App. 3d at 979).

¶ 35    In effectuating an equitable division of property, it is generally helpful for the court to make specific findings as to the value of large assets, such as real estate. See *In re Marriage of Woolsey*, 85 Ill. App. 3d 636, 637 (1980) (explaining that "it would have been preferable for the court to make a specific finding as to the value of the residence"). However, the court is not required to value every asset. *In re Marriage of Jerome*, 255 Ill. App. 3d 374, 392-93 (1994); *Woolsey*, 85 Ill. App. 3d at 637.

¶ 36    Valuation of a marital asset is a question of fact to be determined by the trial court. *Tietz*, 238 Ill. App. 3d at 975. In order to determine the value of marital assets, the court must have before it competent evidence of value. *In re Marriage of Stone*, 155 Ill. App. 3d 62, 70 (1987). While there is no rule of law regarding what type of evidence constitutes "competent evidence" of value, the value of real estate is ordinarily proven through the testimony of expert witnesses who have conducted appraisals of the property. See, *e.g.*, *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 69; *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 962-64 (1992); *Stone*, 155 Ill. App. 3d at 65-66; *In re Marriage of Weinberg*, 125 Ill. App. 3d 904, 910-11 (1984). The record in this case contains no such evidence.

¶ 37    Don testified at the April 2015 hearing that he believed the total value of the two properties was between $180,000 and $200,000. He did not explain how he arrived at this estimate, and he did not state how much he thought each property was worth. At a later hearing, Mary attempted to testify as to what she believed the properties were worth, but Donald objected on the grounds that Mary was not qualified as an expert to give an opinion. The court sustained the objection.[1] Mary then offered into evidence the 2014 Randolph County tax assessments for the two properties. The assessments listed the fair market value of the rental property at $68,920

---

[1]The court initially overruled Don's objection; however, when Mary attempted to explain that she arrived at her opinion as to the value of the two properties by researching comparable sales, the court sustained the objection on the basis that Mary was not a qualified expert in real estate appraisal.

and the fair market value of the marital home at $106,260. Mary argues that Don's testimony and the tax assessments were competent evidence of value that the court was required to accept. We disagree.

¶ 38 We note that in *Woolsey*, there is some support for the proposition that a court may consider the type of evidence presented here to be competent evidence of value. There, both parties testified that they thought the value of their home was approximately $50,000. *Woolsey*, 85 Ill. App. 3d at 637. The trial court awarded possession of the home to the wife until either she remarried or the parties' youngest child reached adulthood, whichever happened first. The court ordered the house to be sold and the proceeds divided once either of those two events occurred. *Id.* The husband argued on appeal that the trial court abused its discretion by failing to make an explicit finding as to the value of the home. *Id.* The Fourth District rejected this argument, holding that although it would have been better for the trial court to have determined the value of the home, it was not required to do so. The court noted that the record before it contained "competent evidence as to the value of the property," referring to the testimony of the parties as to its value. *Id.*

¶ 39 Generally, however, a court's determination of the value of an asset "cannot be based on testimony that is not supported by a proper foundation." *Liszka*, 2016 IL App (3d) 150238, ¶ 56. Even the testimony of a qualified expert may be rejected or found not to be credible evidence of value if it is not based on market analysis or an inspection of the home. See *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 152 (2005). Here, Don gave an opinion as to the value of the property, but he was not qualified as an expert in real estate appraisal, and he provided no basis for his opinion. Mary presented documents showing the fair market values of the properties as determined by the Randolph County Tax Assessor. While these values were presumably

determined through some sort of appraisal process, that process likely did not include an inspection of the actual condition and interior features of the two properties.

¶ 40    Moreover, marital assets must be valued as near in time as possible to the date the marriage is dissolved. Assets may be valued at the time of trial if the date of trial "is not too far removed from the entry of the dissolution judgment." *Id.* In this case, the judgment dissolving the parties' marriage was not entered until May 2017. The valuation evidence presented by both parties related to the value of the properties at least two years before that date. Don gave his estimate of the value of the property in April 2015, and Mary submitted into evidence tax assessments showing the value ascribed to the properties by the Randolph County Tax Assessor in 2014. Thus, even if this evidence could be considered competent evidence of the value of the properties early in 2015, there was no competent evidence of their value at any time even remotely close to the May 2017 date of dissolution.

¶ 41    Mary, however, emphasizes that the parties' evidence of the value of the two properties was consistent. The sum of the fair market value listed in the tax assessments she supplied is $175,180, which is within the $180,000-to-$200,000 range opined to by Don. Mary points out that a court's valuation of an asset will not be found to be against the manifest weight of the evidence if it is within the range of values testified to by the parties' experts. See *Schuster*, 224 Ill. App. 3d at 977-78; *Stone*, 155 Ill. App. 3d at 71; *Weinberg*, 125 Ill. App. 3d at 910. This argument correctly states the law. But it does not follow from this that a court is required to value an asset within the range suggested by nonexpert evidence it explicitly finds not to be credible evidence of value.

¶ 42    Mary further argues that the court abused its discretion by ordering the properties to be sold due to two intangible considerations. First, the marital home was in Mary's family for over 90 years, and it presumably had some sentimental value to Mary. Second, Katelyn resided

- 13 -

primarily with Mary, and allowing Katelyn to remain in the marital home by awarding it to Mary would offer her a sense of stability and "continuity in [her] environment." See *Tietz*, 238 Ill. App. 3d at 980-81. We are not persuaded.

¶ 43    The evidence at trial reveals that the parties purchased their marital home from Mary's father and aunt in 1989. The home belonged to Mary's grandparents when she was a child, and she lived in the home as an adult while she was dating Don. In addition, there was testimony that Katelyn was having some difficulty handling the stress of her parents' divorce and other recent events, including the deaths of two of her friends and an illness Mary went through early in 2012. Katelyn testified that spending time with her horses provided her with stability and helped her cope with stressful situations, much as a therapy dog might help other people.

¶ 44    In arguing that the court abused its discretion in ordering the home to be sold, Mary emphasizes that allowing a child to remain in the family home is one way to help provide that child with stability. See *id.* She points out that, for this reason, an award of the marital home to the custodial parent is "normally preferred." *Minear*, 287 Ill. App. 3d at 1083. However, this is only one factor a court should consider in dividing the parties' assets, and a court does not necessarily abuse its discretion if it does not award the marital home to the custodial parent. *Id.*

¶ 45    Here, as we have just discussed, the court was unable to accurately value the two properties at issue due to the parties' failure to present competent evidence of their value. Without such evidence, ordering the properties sold and the proceeds split was the only realistic way to divide the parties' assets in an equitable manner. It is the responsibility of the parties in a dissolution proceeding to provide the court with sufficient evidence of the value of their property. *Liszka*, 2016 IL App (3d) 150238, ¶ 40. Neither party should be allowed to benefit on appeal from their own failure to introduce competent evidence of value at trial. *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 29; *In re Marriage of Smith*, 114 Ill. App. 3d 47, 54

(1983). It is also worth noting that the dissolution judgment gave Mary the right to purchase Don's interest in the properties prior to any listing agreement being signed. Thus, the court gave her the option of remaining in the home with Katelyn. Considering all of the circumstances of this case, we find no abuse of discretion.

¶ 46                                    C. Assignment of Debts

¶ 47     Mary next argues that the court erred in its assignment of marital debts. Her argument is twofold. First, she contends that the court failed to assign a substantial portion of the parties' marital debt at all. Second, she argues that it abused its discretion by assigning her a larger share of the debt it did assign. We agree with her first contention.

¶ 48     During the March 2016 hearing, Mary attempted to offer into evidence Respondent's Exhibit 3, a spreadsheet listing all of the marital debts she asserted were owed. Attached to the spreadsheet were 124 pages of receipts, bills, correspondence related to loans, and other documents. Although Mary's counsel indicated that he was offering the exhibit only as a demonstrative exhibit, we note that the attached documentation was also part of the exhibit.

¶ 49     At the end of the March 2016 hearing, the court found that Mary had not provided a sufficient foundation to admit Exhibit 3 into evidence. The court reserved ruling on its admissibility, explaining, "I'm going to withhold entry of this until the foundation's laid." The court noted that laying a proper foundation would require Mary to "go point by point." At the July 2016 hearing, however, the court interrupted Mary's counsel as he attempted to question her about the list of debts to lay the foundation. The court told counsel that there was no reason for Mary to testify concerning anything other than her claim of dissipation, noting that the parties had "stipulated" that a third hearing was needed to address that question. Counsel reminded the court that at the previous hearing, it had requested testimony from Mary that would lay the foundation for admission of the exhibit, "line by line." The court responded, "I don't recall what

- 15 -

you're talking about." Counsel moved on to other matters, and the court never ruled on the admissibility of Mary's Exhibit 3.

¶ 50    In the section of the dissolution judgment addressing the parties' debt, the court assigned a $4200 vehicle loan to Don, and it ordered each of the parties to pay half of two additional debts, a $2852.84 judgment in favor of Security Finance and a $1498.22 judgment in favor of Buena Vista National Bank. The court addressed some of the parties' other debts in other sections of the judgment. The court ordered the parties to divide equally the $24,085 owed to Katelyn's school for two years of tuition. It also ordered each party to pay half of their obligations for federal and state income tax and half of the property taxes owed on both properties. The court did not address any of the other debts listed in Mary's Exhibit 3.

¶ 51    The trial court in a dissolution proceeding must allocate both the parties' marital property and their marital debts. 750 ILCS 5/503(a) (West 2014). Marital debts, like marital assets, must be distributed equitably. *In re Marriage of Awan*, 388 Ill. App. 3d 204, 212-13 (2009); *In re Marriage of Davis*, 292 Ill. App. 3d 802, 807 (1997). An equitable allocation of debts need not be mathematically equal. *Awan*, 388 Ill. App. 3d at 213.

¶ 52    We first note that we disagree with Mary's assertion that the court assigned her 70% of the marital debt it addressed. She arrived at this conclusion by including her attorney fees as an assigned marital debt. Attorney fees are not a marital debt. See *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 58 (explaining that if marital funds are used to pay attorney fees related to the dissolution, they must be treated as an advance from the marital estate). Also, the list of marital debts reflected in the demonstrative exhibit Mary created includes her own attorney fees, but does not include Don's attorney fees. Both parties were ordered to pay their own fees. However, we need not consider whether the assignment of debts is equitable because we find it necessary to remand this matter to allow the court to consider additional evidence concerning the

- 16 -

parties' marital debts. Because this will likely result in the assignment of additional debts, the question of whether the court's current assignment of debt was equitable will be rendered moot.

¶ 53 As stated previously, we agree with Mary's assertion that the court did not assign all of the parties' marital debt. We recognize that the trial court was faced with a difficult task in this case. The matter remained pending for over four years due to various delays attributable to the parties, and Mary attempted to present evidence of the parties' marital debts through a complicated exhibit totaling over 100 pages. In addition, the testimony Mary attempted to offer about the debts focused on a spreadsheet she created. However, it is apparent from our review of the documentation attached to Mary's Exhibit 3 that the parties had substantial marital debt that was not addressed by the court at all in its judgment of dissolution. As discussed earlier, the court reserved ruling on the admissibility of Mary's exhibit containing evidence of these debts, but it then failed to give her an opportunity to lay the foundation for the exhibit. It is therefore necessary for us to remand this matter to the trial court so that the court can rule on these unresolved questions.

¶ 54 We address three considerations that are likely to arise on remand. First, the list of debts in Mary's exhibit includes medical bills for Mary and Katelyn and debt related to the two pieces of real estate, which appear to be well-documented by the attached bills and receipts. The list also includes various loans from individuals she knew. Some of these loans were for living expenses, while others were used to pay specific debts for medical bills, overdue boarding fees for the horses, and debts related to the real estate. We note that loans from friends or relatives are typically viewed with some suspicion by courts. See *Awan*, 388 Ill. App. 3d at 213. However, such loans *can* be found to be valid marital debts, particularly in cases where, as here, the party who incurred the debts claims that it was necessary to do so because the other party has not made court-ordered payments. See *id.* at 214. The court is not required to find all of the debts listed in

Mary's Exhibit 3 to be valid marital debts. However, the court is required to give her an opportunity to prove that the debts exist and that they were incurred for marital purposes. Failure to do so results in a distribution of marital debt that is not equitable.

¶ 55   Second, the documentation attached to Mary's Exhibit 3 includes overdue stable fees and veterinary bills for Katelyn's horses. As we discussed previously, the court will have to decide on remand whether to order Don to contribute to expenses related to Katelyn's horses in the future. Regardless of what it determines, we find that expenses for the horses while the dissolution proceedings were pending are marital expenses because the horses were purchased during the marriage for the parties' minor child. Thus, if the court finds that Mary's evidence is sufficient to prove the existence of debts for the horses, it should consider them along with other marital debts and divide them between the parties in an equitable manner.

¶ 56   Third, we note that although we find no abuse of discretion in the court's assignment of the debts it did address, the court may find that an equitable division of the parties' total debts would be better achieved by assigning some of those debts differently. For this reason, we will vacate the portions of the court's judgment assigning debts.

¶ 57          D. Dissipation of Funds From Don's Checking Account

¶ 58   Mary next argues that the court erred in finding that she failed to make a *prima facie* showing of dissipation of marital funds by Don. Mary attempted to demonstrate dissipation in three different ways. She attempted to show that (1) Don's withdrawals from his checking account exceeded his living expenses based on the information he provided in his financial affidavits, (2) Don made withdrawals of over $160,000 from the account for unidentified purposes, and (3) Don liquidated his retirement accounts. We will address the liquidation of the retirement accounts in the next section of this decision. We agree with Mary's contention that

she made a *prima facie* showing of dissipation with respect to Don's withdrawals from his checking account.

¶ 59 Mary first attempted to raise the question of dissipation at the April 2015 hearing. Don testified at that hearing that he had no funds left in either of his two retirement accounts. He explained that he cashed in both accounts to pay overdue taxes, mortgage payments, and late fees. On cross-examination, he testified that he previously had retirement accounts with Lincoln and Thrivent. He estimated that before he cashed it out, the account with Lincoln had a balance of about $16,000 or $17,000. Although Don's attorney made no objection, the court interjected at this point to ask the relevance of questions concerning the value of the accounts. Mary's attorney went on to cross-examine Don on other matters.

¶ 60 When Mary took the stand, her attorney attempted to ask her about the two retirement accounts. The court again interrupted and asked counsel the relevance of his questions in light of the fact that the accounts had been depleted. The following exchange occurred:

> "THE COURT: So what would be the relevance of going into that?
>
> MR. HAYES [COUNSEL FOR MARY]: Dissipation of marital assets.
>
> THE COURT: Have you filed a claim for dissipation?
>
> MR. HAYES: We have a claim. I feel that she would be entitled to—
>
> THE COURT: Statute requires that you file a claim for dissipation 90 days before.
>
> * * *
>
> MR. HAYES: Your Honor, it's not so much I'm claiming that this is dissipation as it is—it's utilizing marital funds to pay debts that he should have paid pursuant to court order.
>
> * * *

THE COURT: Well, if it has to do with a court order, we agreed we're not hearing that now."

Counsel moved on to question Mary on other matters.

¶ 61    Three days later, on April 10, 2015, Mary filed a notice of intent to claim dissipation of marital assets. In it, she asserted that Don dissipated a total of $97,788 in marital funds between January 1, 2010, and December 31, 2014. She alleged that the marriage was irretrievably broken during this period. Attached to the motion were several spreadsheets in which Mary attempted to illustrate that Don's cash withdrawals from his checking account exceeded the living expenses he claimed he was incurring in his financial affidavit. Neither the motion nor the attached spreadsheets addressed the funds withdrawn from Don's retirement accounts.

¶ 62    As we discussed earlier, discovery was reopened, and the matter was continued for nearly a year. At the next hearing, on March 21, 2016, Mary's attorney began questioning her about Respondent's Exhibit 4, a spreadsheet Mary created comparing Don's bank records from 2010 through 2015 to the living expenses he attested to in his financial affidavits. The court asked the relevance of this line of questioning. Counsel replied, "I'm going to introduce evidence as to what his income was over and above his living expenses to show dissipation." Don's attorney objected, arguing that Don's living expenses had changed and that there was no foundation for the spreadsheet created by Mary. The court again asked Mary's attorney the relevance of the exhibit. In response, Mary's counsel argued that the purpose of the exhibit was to prove that Don was spending "excessive" amounts of money "over and above his living expenses." He further argued that the burden would then shift to Don to show that the money was used for marital purposes. The court admitted Mary's spreadsheet as a demonstrative exhibit over Don's objection. The court admitted Don's 2010 to 2015 bank statements without objection.

¶ 63 Mary then testified that she calculated that Don withdrew $160,122 from his account above his claimed living expenses for this period. She testified that she did not know whether any of the funds were spent for marital purposes. She acknowledged that prior to the parties' separation, Don spent all of his money for marital purposes.

¶ 64 The matter was continued again. The final hearing, on July 8, 2016, focused almost exclusively on Mary's claim of dissipation. The evidence Mary presented at the hearing was similar to the evidence she presented at the March 2016 hearing, with two differences. First, she introduced additional evidence concerning Don's bank records during the first half of 2016. Second, she took a different approach. This time, instead of comparing Don's withdrawals from the accounts to his stated living expenses, she attempted to show that Don withdrew substantial amounts of cash that were not clearly spent for marital purposes.

¶ 65 To support this theory, Mary introduced four exhibits into evidence. Exhibit 8 was a spreadsheet Mary created that summarized Don's income and withdrawals. The spreadsheet was based on the monthly statements from Don's bank account from 2010 to 2016. The bank statements were admitted as Exhibit 9. Exhibit 11 consisted of receipts Don provided to Mary. Some of the receipts indicated that Don paid cash. Exhibit 10 was another spreadsheet created by Mary. It summarized the receipts provided by Don and indicated whether each was paid in cash. All four exhibits were admitted without objection, but the spreadsheets were admitted only as demonstrative exhibits.

¶ 66 Mary testified during the hearing about how she prepared the two spreadsheets and what she thought they showed. She first noted that the spreadsheets covered all of 2010 through the first half of 2016. She explained that she used the ending balance from Don's final bank statement of 2009 as a starting point. Mary testified that the bank statements showed that Don deposited a total of $441,696 into the account over the following 5½ years. She testified that

during the same period, he made $271,848 in withdrawals from the account for "identified expenses" and $174,483 in cash withdrawals and other unidentified expenditures.

¶ 67   Mary further testified that the receipts provided to her by Don showed that he used approximately $6500 to pay for marital expenses in cash. (We note that based on the calculations reflected in the exhibits and her testimony, the precise amount was $6664.) Mary then testified that after taking into account the receipts for marital expenses paid for with cash, the unaccounted-for cash withdrawals from Don's bank account between 2010 and 2016 totaled $167,819.

¶ 68   Mary testified that she did not know whether any portion of the $167,819 was used for marital purposes. She explained that she did not know what any of the funds were used for. She acknowledged, however, that all of the identified expenditures were for marital purposes— including the cash receipts and the bank withdrawals she considered to be for identifiable expenses.

¶ 69   The court asked counsel for Mary what must be demonstrated in order to make a *prima facie* showing of dissipation. Counsel responded, "Showing that there's unaccountable for—cash over and above marital expenses." The court then asked counsel, "What if he spends cash, and he doesn't get a receipt?" Counsel argued that it would be up to Don to explain the purposes for which the cash was spent. The court asked if this meant that Don "would have to account for every penny that [he] spent over the last five years." Counsel replied, "That's what the case law says." The court noted that the case law provided to it by the parties addressed the burden of a spouse charged with dissipation after a *prima facie* showing of dissipation has been made, but did not really address the question of what evidence was necessary to make a *prima facie* showing. The court asked both parties to provide additional authority on that question when they submitted written arguments.

¶ 70    On cross-examination, Mary was asked whether Don "typically" used cash to pay for things during the parties' marriage. She replied, "Sometimes he did. Sometimes he paid with a check." She further testified that during the marriage, Don did not carry a credit card "on a regular basis," and he often paid for things like restaurant bills in cash. She also noted that she was aware that after the parties separated, Don sometimes paid his rent in cash, and he sometimes gave her cash to pay for bills.

¶ 71    After Mary finished her testimony, the court asked counsel for Don if he had any rebuttal evidence or a defense to the claim of dissipation. Counsel responded by arguing that Mary did not meet her burden of making a *prima facie* case of dissipation. He emphasized her testimony that Don used cash to pay some bills during the marriage. He argued that this practice was what Don "was accustomed to and did during their marriage." Mary's attorney argued in response that once Mary showed that Don "liquidated marital assets," the burden shifted to Don to explain how those assets were used. The court expressed doubt as to whether a bank account can be liquidated, explaining that cash by its very nature is a liquid asset. The court also asked what nonmarital purpose Mary believed the cash had been used for. Her attorney argued that it was not Mary's burden to show that the cash had been used for nonmarital purposes.

¶ 72    The court noted that the case law on the question of a *prima facie* showing of dissipation is not "very clear on that." In spite of its earlier request for additional authority on the question, the court ruled from the bench that Mary failed to make a *prima facie* case.

¶ 73    On appeal, Mary argues that the court erred in ruling that she failed to make a *prima facie* showing of dissipation. Before addressing the merits of her argument, we must address Don's contention that Mary's notice of intent to claim dissipation was not timely. The relevant statute provides that a court may consider the dissipation of assets only on the condition that "a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after

discovery closes, whichever is later." 750 ILCS 5/503(d)(2)(i) (West 2014). Discovery closed in this case on March 23, 2015. Mary filed her notice of intent on April 10, which was less than 30 days after this date. As such, her notice was timely under the express terms of the statute.

¶ 74   Don, however, emphasizes that Mary's notice was filed after the hearings in this case began. The statute does not expressly require that a notice of intent be filed before the start of trial. However, we recognize that there are circumstances under which it would be unfair to require a party to refute a claim of dissipation raised after the start of trial even if the other party complied with the statute. We do not find such circumstances to be present in this case.

¶ 75   We are guided in this determination by cases that arose before the requirement of a notice of intent went into effect. See Pub. Act 97-941, § 5 (eff. Jan. 1, 2013) (amending 750 ILCS 5/503(d)(2)) (adding the relevant requirement). Such cases addressed the issue in terms of fairness to the party charged with dissipation or forfeiture by the party claiming dissipation. They held that trial courts could find dissipation as long as the party found to have dissipated assets had sufficient notice to refute the claim. See, *e.g.*, *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶¶ 60-62 (finding that the husband did not forfeit his claim of dissipation despite his failure to file a notice of his intent pursuant to a local court rule where various pretrial pleadings made it clear to the wife that he intended to raise the issue); *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 206 (2005) (upholding the trial court's *sua sponte* finding of dissipation where the record indicated that parties were put on notice that dissipation would be an issue); *In re Marriage of Henke*, 313 Ill. App. 3d 159, 178 (2000) (upholding a court's finding of dissipation even though the wife did not expressly charge the husband with dissipation where her attorney presented evidence on the question and the husband had the opportunity to refute the claim); *In re Marriage of Davis*, 215 Ill. App. 3d 763, 777 (1991) (finding that the wife did not forfeit

her claim of dissipation where the record showed that the husband "knew from the start of the trial" that she intended to assert the claim).

¶ 76    We recognize that the statutory amendment would change the results of these cases, particularly those in which the court found dissipation *sua sponte*, because the notice required by the statutory amendment is mandatory. See 750 ILCS 5/503(d)(2)(i) (West 2014) (providing that the requisite notice "*shall*" be given (emphasis added)). However, we also recognize that the facts underlying claims of dissipation often remain hidden until they are uncovered during the process of discovery or even through testimony at trial. See, *e.g.*, *In re Marriage of Zweig*, 343 Ill. App. 3d 590, 599 (2003) (describing evidence that the wife "secreted away" marital assets). We therefore believe that a claim of dissipation should be considered as long as it complies with the express requirements of the statute and also comports with the notions of fairness that animated decisions such as *Brown*, *Vancura*, *Henke*, and *Davis*.

¶ 77    Here, as we have already discussed, Mary's notice of intent to claim dissipation complied with the express requirements of the statute. In addition, we find that under the circumstances of this case, Don had ample notice that dissipation would be an issue. Mary addressed the issue in court on April 7, 2015, and filed her notice of intent three days later. The matter was continued for 11 months to allow the parties to conduct further discovery, and it did not conclude until July 8, 2016, more than a year after Mary raised the issue. Because Mary filed her notice of intent within the time period mandated by the statute and Don had the opportunity to refute the claim, her notice was timely and the question of dissipation was properly considered by the court.

¶ 78    We turn now to the merits of Mary's contention. Dissipation is the use of marital assets for the benefit of one spouse for purposes unrelated to the marriage while the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008). The party alleging dissipation must first make a *prima facie* showing that dissipation has

occurred. *Brown*, 2015 IL App (5th) 140062, ¶ 66. Once this showing has been made, however, the burden shifts to the party charged with dissipation to show with clear and specific evidence how the funds were spent. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 65; *Jerome*, 255 Ill. App. 3d at 395.

¶ 79     Whether a party's conduct constitutes dissipation depends on the facts and circumstances of the particular case. *In re Marriage of Rai*, 189 Ill. App. 3d 559, 565 (1989). Because dissipation is a factual inquiry, we will reverse the trial court's findings on the question only if they are against the manifest weight of the evidence. *Holthaus*, 387 Ill. App. 3d at 374; *Vancura*, 356 Ill. App. 3d at 204. The court's findings are against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if the findings are not based on the evidence. *Holthaus*, 387 Ill. App. 3d at 374.

¶ 80     The court in this case grappled with the question of what Mary needed to show in order to make a *prima facie* showing of dissipation. It is clear that the party claiming dissipation is not required to demonstrate that the funds at issue were used for a purpose unrelated to the marriage. See *Jerome*, 255 Ill. App. 3d at 395. What is somewhat less clear is what a party must show where, as here, the alleged dissipation involves moderate expenditures and withdrawals that add up over time. This is likely because, in many cases, the *prima facie* evidence of dissipation consists of large withdrawals of cash from the parties' bank accounts. See, *e.g.*, *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶¶ 9, 11 (evidence that the husband "essentially depleted" the marital funds in a savings account by making "a few large transfers over a short period" of time); *Vancura*, 356 Ill. App. 3d at 203 (evidence that the husband cashed a $16,000 check made out to a family business without the wife's knowledge or consent); *Henke*, 313 Ill. App. 3d at 177 (evidence that the husband took an IRA distribution of $33,669); *Tietz*, 238 Ill. App. 3d at 981 (evidence that the husband transferred $35,976 from a joint account to his individual

checking account); *In re Marriage of Toth*, 224 Ill. App. 3d 43, 46 (1991) (evidence that the wife liquidated several accounts). However, that is just one of the ways to make a *prima facie* case of dissipation.

¶ 81 Dissipation is premised on the diminution or devaluation of the marital estate. *Brown*, 2015 IL App (5th) 140062, ¶ 67. Loss of value does not always occur because of a single large withdrawal of funds. Thus, a *prima facie* case for dissipation can be made by showing that a spouse's mismanagement of marital assets over time caused losses to the marital estate. See *id.* ¶ 68 (evidence that the marital home was damaged in a fire after the wife failed to pay property insurance and evidence that three pieces of marital property were lost to foreclosure due to her failure to make mortgage payments). Dissipation can also be shown by demonstrating that a spouse's use of marital funds for his or her living expenses is "selfish, excessive, and improper." *Id.* ¶ 67 (citing *In re Marriage of Carter*, 317 Ill. App. 3d 546, 551-52 (2000)); see also *In re Marriage of Murphy*, 259 Ill. App. 3d 336, 339-40 (1994).

¶ 82 A *prima facie* showing of dissipation can also be made, as it was in this case, by showing that cash withdrawn or funds spent by a spouse over a period of months or years added up to a substantial amount. In *Berberet*, for example, the wife presented evidence that the husband spent $21,725 from his workers' compensation settlement over a period of 11 months. This included evidence that he made $4200 in cash withdrawals from an account he opened with the proceeds of the settlement. *Berberet*, 2012 IL App (4th) 110749, ¶ 53. The trial court found that the husband "adequately explained" his use of the funds. It therefore found that no dissipation occurred. *Id.* ¶ 54. The appellate court affirmed this finding. *Id.* ¶¶ 54-56. Significantly for our purposes, however, the court noted that the husband bore the burden of showing how the money was spent. *Id.* ¶ 55. In other words, although the court ultimately found that the husband had not

dissipated the funds, it also found that the wife's evidence of unexplained expenditures and withdrawals that added up over time was sufficient to shift the burden to the husband.

¶ 83　Similarly, in *Davis*, the wife showed that the husband deposited marital funds into a separate account and made withdrawals from that account over time. *Davis*, 215 Ill. App. 3d at 777. He used the account to pay his own living expenses and to pay for vacations with his children. *Id.* at 777-78. The trial court found that the husband did not dissipate the funds, and the appeals court upheld that ruling. *Id.* at 778. In doing so, the court emphasized that the husband "was meticulous about documenting his expenditures and that he accounted for every check written." *Id.* at 777. Thus, although the court did not directly address the question before us, it appeared to find the wife's evidence sufficient to make a *prima facie* case of dissipation.

¶ 84　Another pertinent case is *In re Marriage of Manker*, 375 Ill. App. 3d 465 (2007). There, the wife presented evidence that the husband made several ATM withdrawals and withdrawals of cash from the parties' savings account. *Id.* at 476. The trial court found that she failed to make a *prima facie* showing of dissipation and found that the husband's explanation for how he used the funds was credible. *Id.* at 476-77. The appeals court implied that it disagreed with the first of these findings, emphasizing that once a *prima facie* showing of dissipation has been made, the burden shifts to the other party to show how the funds were used. *Id.* at 477. However, the court then noted that "[t]he trial court emphasized that it 'believed' [the husband's] testimony regarding the withdrawals." *Id.* The appellate court deferred to the trial court's credibility determination and affirmed its ruling on the basis of its finding that the husband demonstrated that his use of the funds was for rent and reasonable living expenses. *Id.* This reasoning similarly implies that the evidence of withdrawals that add up over a period of time is sufficient to make a *prima facie* case for dissipation. See also *Rai*, 189 Ill. App. 3d at 565-69 (finding dissipation where the husband withdrew cash and transferred funds from joint accounts regularly over a

period of years). We find that Mary's evidence was sufficient to make a *prima facie* showing of dissipation.

¶ 85    We note that a *prima facie* showing of dissipation can also be based on evidence that a spouse withdrew funds that far exceeded his or her living expenses over a period of months or years, such as the evidence Mary presented at the March 2016 hearing. See, *e.g.*, *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700-01 (2006); *Murphy*, 259 Ill. App. 3d at 338-39. However, much of the evidence Mary presented at the July 2016 hearing included the same time period as the evidence she presented at the March 2016 hearing. Thus, with the exception of the evidence related to the first half of 2016, the evidence presented at the two hearings is duplicative.

¶ 86    Although we have concluded that Mary made a *prima facie* showing of dissipation, we do not believe that she made a *prima facie* showing of dissipation for the entire period she claims. As we noted earlier, dissipation refers to the use of marital property for purposes unrelated to the marriage during a time when the marriage is undergoing an irreconcilable breakdown. *Holthaus*, 387 Ill. App. 3d at 374. As such, the time frame for calculating begins when the marriage begins to undergo an irreconcilable breakdown, not from the time the breakdown is complete. *Id.* at 375. Thus, dissipation can ordinarily be found based on conduct that occurred prior to the parties' separation or the filing of a dissolution petition. *In re Marriage of Harding*, 189 Ill. App. 3d 663, 676 (1989); *Rai*, 189 Ill. App. 3d at 565. However, if the record does not contain evidence that clearly establishes the point at which the marriage began to break down, dissipation must be measured from the time the parties separated or a petition for dissolution is filed. See *Jerome*, 255 Ill. App. 3d at 394; *In re Marriage of Landwehr*, 225 Ill. App. 3d 149, 150 (1992); *Harding*, 189 Ill. App. 3d at 676. Here, Mary provided evidence of Don's withdrawals and expenditures beginning in January 2010. However, she did not present evidence to show when the marriage began undergoing its breakdown. Absent such evidence,

she can only claim dissipation for the period after the parties separated, which occurred in November 2010. Because we have concluded that Mary made a *prima facie* showing of dissipation for the period from November 2010 through July 2016, we must remand the matter to the trial court to allow Don the opportunity to refute the charge of dissipation.

¶ 87     We address one more issue that is likely to arise on remand—the type of evidence he needs to present to do so. The requirement that a spouse charged with dissipation present clear and specific evidence concerning the use of the funds alleged to have been dissipated means that he cannot refute the charge merely by stating that he used the funds to pay debts or for living expenses. See *Tietz*, 238 Ill. App. 3d at 984. However, we agree with the trial court's apparent concern that it would be impossible for any party to account for every penny of cash spent over the course of five years. In *Manker*, the husband offered into evidence receipts and testified that they were a " 'representative sample' " of his expenses. *Manker*, 375 Ill. App. 3d at 477. He also testified that he routinely used cash withdrawn from an ATM. The trial court expressly found this evidence to be credible. *Id.* In *Tietz*, the husband provided a summary of his major expenditures during the relevant period. *Tietz*, 238 Ill. App. 3d at 981-83. Similar evidence would suffice here, assuming the court finds it to be credible. See *id.* at 983-84.

¶ 88                                E. Don's Retirement Accounts

¶ 89     Mary's next argument concerns funds withdrawn from Don's retirement accounts. As discussed earlier, Don acknowledged liquidating his two retirement accounts in order to pay $14,003.11 in debts he was ordered to pay. There is no dispute that he met this obligation after liquidating the accounts. However, Mary alleges that he withdrew a total of $21,150.38 from the accounts, and he did not deposit the remaining $7147.27 into a trust account, as he was ordered to do. Mary argues that the court erred in not awarding her half of the remaining $7147.27. We disagree.

¶ 90    Mary provides two alternative bases for her argument. First, she argues that she made a *prima facie* showing that Don dissipated these funds. As she points out, Don acknowledged liquidating the accounts. This is ordinarily sufficient to make a *prima facie* case of dissipation. See, *e.g.*, *Henke*, 313 Ill. App. 3d at 177; *Toth*, 224 Ill. App. 3d at 46. However, a court may only consider dissipation of assets on the condition that the party alleging dissipation files a notice of intent to claim dissipation that comports with statutory requirements. 750 ILCS 5/503(d)(2) (West 2014). The statute requires that the notice include "an identification of the property dissipated." *Id.* § 503(d)(2)(ii). Because Mary's notice of intent to claim dissipation did not address the funds withdrawn from Don's retirement accounts at all, this statutory requirement was not met. Thus, the court cannot consider whether Don dissipated these funds.

¶ 91    Second, Mary argues that she was entitled to half of the funds from Don's retirement accounts because the accounts were marital assets. Mary is correct in stating that pensions and other retirement benefits earned during the marriage are marital assets. See *Davis*, 215 Ill. App. 3d at 773. However, she overlooks the fact that the distribution of marital assets, including retirement accounts, is a matter within the court's discretion. *Tietz*, 238 Ill. App. 3d at 979. She also overlooks the fact that her retirement accounts were also marital assets. For the reasons that follow, we find that the court's decision to award both parties their own retirement accounts was not an abuse of discretion.

¶ 92    The record contains limited evidence as to the precise value of Mary's retirement accounts at the time of the dissolution. Mary testified at the April 2015 hearing that she had a retirement plan with Emerson Electric that was then valued at approximately $1400. In a financial affidavit filed on March 21, 2016, Mary indicated that she had just under $1100 remaining in that account. She also listed a second retirement account worth $1913, for a total of $2913. There is no indication in the record as to whether the Emerson Electric account lost value

due to falling stock prices or because Mary withdrew $300 from the account. It is worth noting that at a December 2013 hearing on temporary relief, Mary acknowledged that she had withdrawn approximately $13,000 from her retirement accounts to pay bills. Mary did not supply the court with any updated information concerning the value of her retirement accounts when she filed her written arguments in August 2016.

¶ 93    The record likewise contains little evidence as to the precise value of Don's retirement accounts when he liquidated them in October 2014. We recognize that the court did not allow Mary to question Don about the estimated value of the smaller account, but she did not make an offer of proof, and she did not provide documentation of the precise value of either account. However, in its order granting Mary's motion to deposit funds, the court expressly stated that the funds withdrawn from the two accounts totaled $21,150.38, indicating that it accepted Mary's allegation that this was the amount withdrawn.

¶ 94    This evidence showed that both parties used most of the funds in their retirement accounts to pay debts and bills. Mary's accounts contained at least $2913 after she did so, and although Don completely liquidated his accounts, he retained approximately $7147 of the funds from the accounts after paying the debts he was ordered to pay. These funds did not represent a large share of the parties' assets, and the difference in these figures is not substantial. Absent reliable evidence that there is a substantial disparity in the value of the parties' retirement accounts, awarding both parties their own accounts is an appropriate exercise of the trial court's discretion. See *In re Marriage of Evans*, 85 Ill. 2d 523, 532-33 (1981). The court's decision also allows Mary to keep the full benefit of her accounts as well as any future increases, while leaving Don to bear the full consequences of his decision to completely liquidate his accounts. Under these circumstances, we find no abuse of discretion in the court's decision to award both parties their own retirement accounts.

¶ 95                              F. Attorney Fees

¶ 96    Mary's last contention is that the court abused its discretion in refusing to order Don to pay any portion of her attorney fees. We disagree.

¶ 97    Both parties have the primary obligation of paying their own attorney fees. However, in a dissolution proceeding, the trial court may order one party to pay a reasonable portion of the other party's fees. *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 113. The party requesting an award of attorney fees must demonstrate both that she is financially unable to pay the fees and that the other party is able to pay. *Id.* This does not require the party requesting the fee award to show that she is destitute. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 19 (quoting *Kaufman v. Kaufman*, 22 Ill. App. 3d 1045, 1050 (1974)). A party is unable to pay attorney fees if doing so would undermine that party's financial stability or means of support. *Id.*; *Patel*, 2013 IL App (1st) 112571, ¶ 113.

¶ 98    Determining whether an award of attorney fees is appropriate requires courts to consider the same factors they consider in dividing marital property and awarding maintenance. *Patel*, 2013 IL App (1st) 112571, ¶ 113. These factors include the income of each party, the present and future earning capacity of each party, and the marital property awarded to each party. *Id.* Another relevant consideration is any conduct by either party that unnecessarily increased the cost of litigation. *Id.* ¶ 117. Whether to award attorney fees is a matter within the discretion of the trial court. We will not reverse its decision absent an abuse of that discretion. *In re Marriage of Vest*, 208 Ill. App. 3d 325, 332 (1991).

¶ 99    In this case, the court recognized that Don's income was "substantially greater" than Mary's income. For this reason, it awarded her $1642 per month in maintenance. Although the maintenance award does not eliminate the disparity between the parties' incomes, it reduces it substantially. The court also found that the parties received "substantially equal" shares of the

marital property. It is worth noting that Mary was awarded most of the parties' furniture and household goods pursuant to the parties' agreement, making it necessary for Don to purchase replacements for these items to set up a new household. Each party in this case accuses the other of unnecessarily increasing the cost of litigation, and the court appeared to be frustrated with both parties for needlessly prolonging the case. In view of all of these circumstances, we find no abuse of discretion in the court's decision to order both parties to pay their own attorney fees.

¶ 100                                   G. Maintenance

¶ 101   Don raises two arguments in his cross-appeal. He first argues that the court erred "in determining maintenance and that maintenance should be permanent." Although it is not entirely clear from Don's limited argument, it appears that he is challenging both the propriety of awarding maintenance at all and the duration of the maintenance awarded. We disagree on both points.

¶ 102   The propriety, amount, and duration of maintenance are matters within the discretion of the trial court. We will not reverse its decision on any of these matters absent an abuse of discretion. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93.

¶ 103   In determining the propriety of maintenance, courts consider "all relevant factors," including the income and property of both parties, the realistic current and future earning capacity of the parties, the impairment of either party's earning capacity because of a decision to forgo education due to the marriage, the standard of living established during the marriage, and the duration of the marriage. 750 ILCS 5/504(a) (West 2014). Although the court must consider all relevant factors, it need not give them equal weight. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 293 (2010).

¶ 104   Don argues that the court abused its discretion in finding maintenance to be proper for three reasons. First, he argues that because Mary continues to live in the marital home, she

enjoys the standard of living established during the marriage without receiving maintenance. See 750 ILCS 5/504(a)(6) (West 2014). We disagree. Don's argument overlooks the fact that the court ordered the parties to sell the marital home and divide the proceeds, a ruling we have upheld. More importantly, there is more to the standard of living established during the marriage than living in a specific building. Here, there was not a lot of evidence about the standard of living the parties enjoyed during the marriage. However, there was evidence that they owned multiple vehicles, two horses, and a boat. These are things Mary likely cannot afford on her salary alone, which is approximately half of what Don earns. Moreover, assuming Mary purchases Don's interest in the home and continues to live there, she will have to maintain the home in addition to meeting her other living expenses. A party should not be required to expend her assets in order to live at something approximating the standard of living enjoyed during the marriage. *Minear*, 287 Ill. App. 3d at 1081. The court explicitly found that Mary required maintenance in order to maintain the standard of living established during the marriage, and we believe the record supports this finding.

¶ 105 Second, Don argues that Mary's income from her job "will place her in the same or better standard of living than she maintained for the majority of her married life." He does not offer any explanation or support for this bald assertion. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (providing that an appellant's brief must contain the reasons for the appellant's contentions along with appropriate citations to authority and "pages of the record relied on"). Moreover, for the reasons we have just discussed, we agree with the trial court that Mary's income is not sufficient to allow her to live at the standard of living established during the marriage. We therefore reject Don's argument to the contrary.

¶ 106 Third, Don argues that the court failed to consider the parties' future earning capacity. See 750 ILCS 5/504(a)(3) (West 2014). He claims that while he expects his earning capacity to

decrease, Mary's can only continue to increase. We disagree with his characterization of the record. We note that both parties offered somewhat self-serving testimony concerning their future earning capacity. Mary testified that there was no room for advancement at her job because she does not have a four-year college degree. Don testified that beginning in June 2015, his income would consist of a base salary of $48,000 per year plus commissions. He further testified that although his sales territory would increase, his rate of commission would decrease. He predicted that his overall earnings would decrease as a result of these changes. The court was not required to find all of the statutory factors relevant, and it was not required to accept Don's self-serving assessment of his future earning capacity. If Don's income does decline over time, a petition to modify maintenance would be appropriate. See *id.* § 510. The mere possibility that Don's income may decrease over time does not negate the propriety of maintenance in light of the current disparity in the parties' incomes.

¶ 107   Moreover, we find that a reasonable assessment of all relevant statutory factors supports the court's decision to award maintenance. As we have discussed, Don's income at the time of the dissolution proceedings was nearly twice Mary's income. See *id.* § 504(a)(1). As we have also discussed, Mary's income was not sufficient to allow her to live at the standard of living established during the marriage. See *id.* § 504(a)(6). Further, an award of maintenance is appropriate due to the parties' lengthy marriage. See *id.* § 504(a)(7). And finally, Mary's present and future earning capacity has been impaired by two decisions the parties made during their marriage. First, they decided that Mary would forgo the opportunity to complete her education so that she could work at a job closer to her sons' schools. As noted earlier, this required her to leave a job with an employer that was paying her tuition. Second, the parties decided that Mary would leave the workforce for a substantial amount of time to be a stay-at-home mother to their

daughter, Katelyn. See *id.* § 504(a)(4). We find no abuse of discretion in the court's determination that maintenance was proper.

¶ 108   Once the court finds that maintenance is appropriate, it must determine the amount and duration of maintenance. In doing so, courts must consider statutory guidelines as to both the amount and duration. *In re Marriage of Harms*, 2018 IL App (5th) 160472, ¶ 27 (citing 750 ILCS 5/504(b-1)(1) (West 2016)). The court is not required to order maintenance in accordance with the statutory guidelines. However, if the court departs from the guidelines, it must make specific findings as to the amount and/or duration of maintenance that would have been ordered pursuant to the guidelines and the court's reasons for departing from those guidelines. *Id.* (citing 750 ILCS 5/504(b-2)(2) (West 2016)).

¶ 109   Here, the court calculated the amount of maintenance in accordance with the statutory guidelines, and its award of permanent maintenance was also in accordance with the statutory guidelines for the duration of maintenance after marriages of 20 or more years. See 750 ILCS 5/504(b-1)(1)(B) (West 2014). Don does not challenge the amount of maintenance, but he does argue that an award of permanent maintenance was "an extreme result" and that the court abused its discretion by not allowing "a review of maintenance after a period of time" due to his claim that his income is likely to decrease. We are not persuaded.

¶ 110   The new statutory guidelines provide that for a marriage of 20 years or longer, such as the parties' marriage, maintenance should be awarded "for a period equal to the length of the marriage or for an indefinite term." 750 ILCS 5/504(b-1)(1)(B) (West Supp. 2017). Indefinite or permanent maintenance is appropriate in cases where the recipient spouse "devoted significant time to raising a family in lieu of pursuing a career." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 652 (2008). Indefinite or permanent maintenance is also appropriate in cases where the recipient spouse is not employable at an income level sufficient to enable her to live at the

standard of living that was established during the marriage. *Harms*, 2018 IL App (5th) 160472, ¶ 45. Here, as we have discussed, Mary spent a significant period of time raising her daughter instead of pursuing a career. And even before she stopped working outside the home, she turned down opportunities for education that would have enhanced her earning capacity in order to be available to take care of her sons. In addition, as the court found, Mary cannot support herself at the standard of living established during the marriage. For these reasons, we reject Don's claim that an award of permanent maintenance was an "extreme result" or an abuse of discretion.

¶ 111   We also reiterate that an award of maintenance is always subject to modification upon a showing of a substantial change in circumstances. 750 ILCS 5/510(a)(1) (West Supp. 2017). Thus, we reject Don's contention that the court abused its discretion by not making the maintenance award subject to review. We find no abuse of discretion in the court's determination of the propriety or duration of maintenance.

¶ 112                          H. Education Expenses

¶ 113   Don next argues that the court erred in directing him to pay half of the expenses for Katelyn's private high school education. Whether to order a parent to pay a portion of a minor child's educational expenses is a matter within the discretion of the trial court. See 750 ILCS 5/505(a)(2.5)(c) (West 2014). As in all other matters involving child support, we will reverse the court's decision only if we find that it constituted an abuse of that discretion. *In re Marriage of Benkendorf*, 252 Ill. App. 3d 429, 447 (1993). Applying this standard, we reject Don's contention.

¶ 114   In support of his position, Don calls our attention to the Fourth District's decision in *People ex rel. Sussen v. Keller*, 382 Ill. App. 3d 872 (2008). There, the mother filed a petition seeking contribution for her young adult son's college expenses. *Id.* at 873; see 750 ILCS 5/513(a)(2) (West 2006). The trial court ordered the father to pay one-third of the son's

expenses, and the father appealed that ruling. *Sussen*, 382 Ill. App. 3d at 877. In reversing the trial court's decision, the appellate court first noted that the standard of review was abuse of discretion. *Id.* at 878. The court then agreed with the father that the trial court abused its discretion in ordering him to pay for a portion of his son's college expenses because (1) the mother did not present sufficient evidence to demonstrate why her son could not have chosen a less expensive school and (2) the father presented evidence that a less expensive school would have been adequate to meet the son's educational goals. *Id.* at 879. Don argues that here, too, there was insufficient evidence to demonstrate that Katelyn could not have received an adequate education at a public high school. We are not persuaded.

¶ 115   We find *Sussen* distinguishable for two reasons. First and foremost, as noted previously, that case involved a petition for contribution to an adult child's college expenses. *Id.* at 873. That is a critical distinction because even though trial courts have the discretion to order parents to contribute to the cost of college or other postsecondary education, an adult child " 'does not have an absolute right to a college education.' " *Id.* at 878 (quoting *In re Marriage of Spear*, 244 Ill. App. 3d 626, 630 (1993)). By contrast, a minor child does have the right to support that is adequate to meet her needs, including her educational needs. The child's needs are to be determined in reference to the standard of living the child would have enjoyed if her parents' marriage had not been dissolved. *In re Marriage of Dulyn*, 89 Ill. App. 3d 304, 309 (1980). Support of a minor child, unlike an adult child, is the joint obligation of both parents. See *Benkendorf*, 252 Ill. App. 3d at 447 (explaining that support of a minor child is the obligation of both parents).

¶ 116   Second, the evidence in this case was more than sufficient to support the court's decision. Both Katelyn and Mary testified about the reasons for the decision to enroll Katelyn at Lutheran High School South. One reason was the school's strong science curriculum, which was important

to Katelyn because of her interest in veterinary medicine and hippology. See *In re Marriage of Alexander*, 231 Ill. App. 3d 950, 955 (1992) (finding persuasive the mother's testimony that she enrolled her son in a parochial school because it would give him a better education and better preparation for college). Katelyn also testified that she had the opportunity to participate in a club at school called Future Professionals of Medicine.

¶ 117   Another reason for the choice of Lutheran High School South was the proximity of the school to Mary's workplace. Mary testified that the school is located approximately a 15-minute drive from her workplace. This proximity meant that Mary could drive Katelyn to and from school, and it meant that she would be available if Katelyn needed to leave early. By contrast, she testified that if Katelyn were to attend public high school in Red Bud, she would have to walk to and from school, which was a walk of 1.3 miles each direction. Katelyn testified that when her mother drove her home from school, she could participate in after-school activities, and she usually had time to do homework in the school library before her mother picked her up. Katelyn found this to be beneficial because she could ask for help if she needed it.

¶ 118   It is also worth noting that Katelyn attended a private school for elementary school. See *id.* (rejecting the father's claim that the mother's choice of a parochial school was inappropriate after he "basically acquiesced" to that choice for several years). We find no abuse of discretion in the court's decision to order Don to contribute to the expenses for his daughter's private school education.

¶ 119                                     III. CONCLUSION

¶ 120   For the foregoing reasons, we reverse the court's determination that Katelyn's activities related to her interest in horses were not extracurricular activities and the court's finding that Mary failed to make a *prima facie* showing of dissipation of funds from Don's bank account. We vacate the portions of the court's judgment assigning only a portion of the parties' debts. We

remand for further proceedings on those issues consistent with this decision. We affirm the judgment in all other respects.

¶ 121    Affirmed in part, reversed in part, and remanded for further proceedings.

2019 IL App (5th) 170295

NO. 5-17-0295

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DONALD R. HAMILTON JR., | ) | Monroe County. |
| | ) | |
| Petitioner-Appellee and Cross-Appellant, | ) | |
| | ) | No. 13-D-13 |
| and. | ) | |
| | ) | |
| MARY L. HAMILTON, | ) | Honorable |
| | ) | Dennis B. Doyle, |
| Respondent-Appellant and Cross-Appellee. | ) | Judge, presiding. |

---

**Opinion Filed:** June 5, 2019

---

**Justices:**      Honorable Melissa A. Chapman, J.

Honorable Thomas M. Welch, J., and
Honorable Judy L. Cates, J.
Concur

---

**Attorney for Appellant**      Jayni D. Lintvedt, Courtney · Clark Law, P.C., 104 South Charles Street, Belleville, IL 62220

---

**Attorney for Appellee**      Blake G. Meinders, Sprague and Urban, 26 East Washington Street, Belleville, IL 62220