NOTICE

Decision filed 08/28/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230239-U

NO. 5-23-0239

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| AUBRIE SWAFFORD, | ) | Monroe County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 21-D-94 |
| | ) | |
| JESSE SWAFFORD, | ) | Honorable |
| | ) | Christopher E. Hitzemann, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The circuit court's order allocating decision-making responsibility and parenting time is affirmed where its findings are not against the manifest weight of the evidence. The circuit court's order requiring the parties to equally share the children's expenses for education and extracurricular activities is affirmed where respondent failed to present any argument regarding the former to the trial court and his argument regarding the latter is precluded by the invited-error doctrine.

¶ 2  Respondent-appellant, Jesse Swafford, appeals the circuit court's orders that (1) allocated decision-making parental responsibility to petitioner-appellee, Aubrie Swafford, (2) allocated the majority of parenting time to Aubrie, and (3) required the parties to equally contribute to the children's expenses for education and extracurricular activities. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      Aubrie and Jesse were married on October 8, 2017. The parties had two children: N.S., born December 19, 2013, and A.S., born September 9, 2018. Aubrie filed a petition for dissolution of marriage on October 20, 2021. The petition alleged irreconcilable differences and requested full decision-making parental responsibility and the majority of parenting time. Aubrie also filed a motion for temporary relief also requesting full decision-making responsibility, the majority of parenting time, temporary child support, and maintenance. Jesse filed an answer on October 28, 2021, denying the marital relationship was irretrievably broken. The parties were ordered to mediation on November 4, 2021.

¶ 5      On November 12, 2021, Jesse filed a petition for temporary relief requesting temporary and permanent sole decision-making responsibility and further requesting Aubrie return his iPad. Aubrie responded on November 17, 2021, denying Jesse should have the children, admitting she had the iPad, and claiming Jesse had a significant amount of her property that he refused to return.

¶ 6      On December 30, 2021, a mediator report was filed stating that no agreement was reached between the parties on the parental responsibility issues of decision making and parenting time. A second mediator report, filed on April 4, 2022, stated a partial agreement for decision making was reached but no agreement on parenting time was made.

¶ 7      On April 8, 2022, the court entered an order "on a summary basis and the parties otherwise agreeing" granting temporary relief. The order granted, *inter alia*, one week of summer parenting for each parent and required the parties to continue the current parenting schedule until school was dismissed for summer. That schedule provided Jesse parenting time every other weekend from Friday at 5 p.m. to Sunday at 5 p.m. During summer break, the parties would equally divide parenting time with a 2-2-3 schedule: Jesse had the children Monday and Tuesday, Aubrie had the

children Wednesday and Thursday, and the parties would alternate weekends, *i.e.*, Friday, Saturday, and Sunday. The parenting schedule would revert to the previous allocation when school resumed if no alternative order was made; however, Jesse would also have additional parenting time every Tuesday night until the following day when the school year resumed. The order required Jesse to pay $1500 a month in child support and $100 a month in maintenance to Aubrie. Retroactive maintenance was reserved. Jesse was granted exclusive possession of the marital residence, except for a 14-day period during which Aubrie could access the marital home and disburse their personal property. Two witnesses were required to be present. The parties would continue to equally divide tuition and gymnastics costs. An income withholding order was filed April 11, 2022.

¶ 8    On July 8, 2022, an agreed order was entered, awarding Jesse the marital residence in Columbia, Illinois, along with the mortgage related thereto. Jesse agreed to pay Aubrie $20,000 for her equity in the marital home; however, the timing of the payment was reserved to the court and the equity amount could change if Jesse sold the residence prior to finalizing the divorce. Aubrie was awarded her residence in Waterloo, Illinois. Disbursement of personal property from the marital residence was reserved to the court. Each party was awarded their own retirement, investment, checking, savings, and bank accounts in their name. Joint accounts would be closed and split equally within 10 days.

¶ 9    On August 4, 2022, Aubrie filed a petition for civil contempt alleging Jesse only issued one child support and maintenance payment totaling $800 on May 10, 2022. On August 11, 2022, Jesse filed an answer denying the allegations.

¶ 10    The case proceeded to hearing on October 12, 2022. The parties advised the trial court of their stipulations and made handwritten changes to the proposed final judgment of dissolution.

3

They agreed that if parenting time was equally split, Jesse's child support to Aubrie would be $515 each month, but if Aubrie received the majority of parenting time, $1650 was the proper amount for child support. The following testimony was provided at the hearing.

¶ 11    Stella Bean testified that she drove by Aubrie's house at Jesse's request to see if anyone was at Aubrie's house. She disputed doing it multiple times. Stella also appeared at the school where Aubrie worked and stated she was there because she was considering that school for her son. She stated that Jesse did not tell her to seek out Aubrie at the school. She stated that she and Jesse were friends and disputed any romantic relationship. Stella stated that she knew Aubrie's address because Jesse provided it to her. She could not recall if she asked, or Jesse gave her the information.

¶ 12    Jesse testified that he spoke with a realtor about selling the marital property but disputed a "For Sale" sign being in the yard. He clarified that the sign said, "Coming Soon." Jesse also stated that prior to the morning of the hearing, he was unaware that he was dropping N.S. off late for school and claimed Aubrie tricked him by telling him the drop off time was 7:50 a.m., not 7:45 a.m. He agreed the email from Aubrie did not state 7:50. Jesse disputed that he had Stella drive by Aubrie's house multiple times. He also disputed telling Stella to go to the school where Aubrie worked. He explained that Stella was looking for a Catholic school for her son. He told her that if she decided to take her son to that school, not to mention his name because if Aubrie knew, she might not admit Stella's son into the school.

¶ 13    Jesse admitted putting a GPS tracker on Aubrie's vehicle and stated it was on for less than a week. He agreed telling Aubrie that he would hire a private investigator to follow her but stated he never did and later told her he did not hire one. He disputed promising N.S. he would get her a treehouse or a playground if he and Aubrie got back together. He stated that N.S. asked him if they

4

got back together if she could have a treehouse and he said, "I can't promise you that." He did not recall praying with N.S. that "Mommy's heart would be softened." Jesse stated that he prayed with his daughter every night and did not recall every prayer.

¶ 14 Jesse's friend Danielle Midkiff twice prepared recordings of N.S. about parenting time. Jesse disagreed that he put his daughter in the middle of the divorce case. Jesse identified text messages from Aubrie's phone. His message to Aubrie stated, "If she wants to pray then she should" and "she could pray to Jesus to heal your heart. She wanted to pray for you to come home. I said that was between you and God, and healing your heart was a better prayer." He disputed sobbing and crying in front of the children until Aubrie asked him to no longer do that in front of the children. He only remembered Aubrie telling him not to call at all. He did not see the children the first month that he and Aubrie separated. He disputed telling N.S. that he paid for her vacation with child support or saying anything to N.S. about child support. Jesse regretted his decision to put the GPS tracker on Aubrie's car and stated he had no intention to harass or stalk her. He disputed asking his friends to record his children and never asked N.S. to say that she wanted equal parenting time.

¶ 15 Jesse stated that he did not talk to his children about the divorce. When he was talking to N.S. about praying he was not implying that Aubrie was broken. Prayer was an important part of his life. He prayed with his children every night and he believed that was something important in his family. He was not trying to use prayer to turn the children against Aubrie. He never bribed his children to speak badly about Aubrie and believed the school drop off was no later than 7:50 a.m. No one ever brought it to his attention before the hearing that day. Now that he knew, N.S. would not be late and he would ensure there were no tardies. Jesse preferred the children go to Monroe County Christian School and disagreed that he did not speak to Aubrie about his preference.

5

¶ 16    Jesse currently worked from home, typically 8 a.m. to 5 p.m., Monday through Friday, although he was occasionally on call. He changed to this position, so he had more regular hours. He was also in the Reserve and had military drills once a month and two weeks a year at Scott Air Force Base. He believed he had a good relationship with his children and recently taught N.S. to play chess and Yahtzee. He was working with building blocks for A.S. due to his sensory problems. He would visit Aubrie once a month after N.S.'s birth when they were living in different cities. He would call and text N.S. during that time as well. He and Aubrie did well coparenting at that time.

¶ 17    As to their initial relationship, Aubrie moved to Oklahoma for about six months. She got an apartment and was going to school on the GI bill. She and N.S. lived there for about six months and Jesse would visit nightly. They would discuss N.S. but Aubrie did not always include him in decisions. He would inject things, but he never felt like he had the final say in anything. After six months, Aubrie and N.S. moved in with Jesse. They had separate bedrooms. He had a typical role as a father and would change diapers, feed, dress, and bathe N.S., while Aubrie attended school online. When the relationship soured and Jesse told Aubrie that it was not working, she moved with N.S. to Illinois. He would only see N.S. when Aubrie came back for military training in Oklahoma. When Aubrie moved to Illinois, he would call and FaceTime N.S. He did not come to Illinois often because his relationship with Aubrie's parents was strained. Aubrie told him that if he was going to have any relationship with N.S., he needed to move to Illinois. So, he moved to Illinois and got a job. When he moved, he was able to see N.S. every day. He stayed in a room at Aubrie's parent's house until they were able to find a house to purchase and that was the house they lived in after they got married and his son was born. He went to as many prenatal appointments as he could. He also helped with the children in the morning as best he could but admitted Aubrie did more.

6

¶ 18    He and Aubrie disagreed on how often the children should be bathed. He thought it should be done every day. She did not, and it became an issue of contention. When they lived together, it was a joint effort with the kids. When Aubrie moved out, he received no parenting time because Aubrie felt it was best not to confuse the children and denied him overnight visitation with the children because she thought it was detrimental to the children. She would occasionally let him have a few hours here and there. He agreed he was still trying to work on the marriage at that time. When N.S. asked about coming home, Aubrie grabbed the phone from N.S. and would not let Jesse talk to the children. The same thing happened when N.S. told him she had COVID. He believed that he should have a say in the children's medical decisions and to be an effective parent, both of them should have a right to say how the child should be raised. He and Aubrie had differing opinions on immunizations. He wanted the children immunized and she was reluctant to get it done. He agreed that Aubrie told him they needed a new pediatrician. He stated by the time he looked into it, Aubrie had already enrolled A.S. somewhere else. He and Aubrie both attended A.S.'s most recent doctor visit. Aubrie did not tell him that A.S. was allergic to food coloring and no doctor ever stated that A.S. was allergic to food coloring. Jesse never saw any extra energy or aggression in A.S. if he had food coloring.

¶ 19    As to the temporary schedule, Jesse stated that Aubrie interpreted it as her getting three weekends a month and him only getting one, which is not how he interpreted it. He thought they should both have two weekends. Jesse thought the 2-2-3 schedule worked really well. The children did well. His employer had no issues. He did not see any transition issues. The children would come over and start playing. They had a routine during the school year. On Tuesday, he would pick up the children at 5 p.m., come home, get N.S. ready for gymnastics, come back, relax, and make sure N.S.'s homework was done. After that, the kids were bathed. N.S. usually took a shower,

and then they went to bed. He would then get them up, dressed, and fed and then took them to school. He made sure the children completed their schoolwork and then they would go to the park. N.S. would do her workbook. A.S. would work on his speech issues. He did not think the children had any trouble adjusting to a schedule of equal parenting time. On Sundays, they went to church and played. He made sure their clothes were clean because he was required to return the children to Aubrie in the same clothes they were wearing when he got them. He thought Aubrie did a good job with the kids but had issues with her lack of cleanliness. N.S. told him she only took a bath once a week and A.S.'s feet smelled pretty bad, which he thought was odd for a four-year-old. He noticed a lot of diaper rash on A.S. and fecal matter that was not properly cleaned. A picture of the rash was placed into evidence over the objection of Aubrie. He stated that A.S. had the rashes every time he came to his house for at least two or three months. When he told Aubrie, she would blame it on an antibiotic or food coloring.

¶ 20    Jesse testified that Aubrie did not tell him about A.S. falling into the lake. He heard it second hand from N.S. who told him that she saved A.S.'s life. He stated the children should have both parents and his only issue with Aubrie's parenting was the lack of cleanliness and her inability to communicate with him when things happened with the kids. He stated there should be a right of refusal as well if one of the parents was going to be gone more than a day during their parenting time. He had a support system through his church, Hope Christian Church, and friends as well. He thought that N.S.'s interest in Catholicism was because her friends were doing it, not so much an interest in the faith. He thought it was important for the children to attend church with their parents. He stated that N.S. wanted to take ballet and he was fine with that, but Aubrie was not, so N.S. was in gymnastics instead. He stated that he attended one of the four performances when N.S. was in a play and attended two of the four performances in a different play. He had not intentionally

spoken badly of Aubrie in front of the children and did not let others speak negatively about her when the children were present.

¶ 21    Jesse expressed concerns about Aubrie's brother because he had perpetrated a violent assault on his partner. He did not want his children anywhere near him until they were at least 16 years old so they could voice their own concerns. He did not intentionally fail to pay child support; his checks were changed when he switched from the contracting job to the current job. He was current with child support. He did not believe Aubrie should have retroactive support because she had no bills when she was living with her parents. He stated that when she left, she took all of the children's clothes and toys, so he had to replace those.

¶ 22    Jesse agreed that N.S. also had diaper rash and Aubrie blamed that on N.S.'s gluten intake. He could not remember either the previous or the current pediatrician's name. He read the email that he sent after the children got COVID, which asked when A.S. would be tested, that Aubrie please inform him when the kids were ill, and requested information on the kids' pediatrician so he would have it if he needed to take the kids while they were in his care. He disagreed that the emails painted a different picture of him, stating he knew they went to Ideal Pediatrics but was not sure of the name of the physician. Danielle took the children to school once and watched the children for him twice. He took care of the children when he was working from 8 to 5 because he was working from home.

¶ 23    Jesse talked to his neighbors about their houses and for how much they were selling. He stated he still owed $175,000 on the house. He hired a realtor, and the house was probably going to be listed at $290,000. His agreement was to pay Aubrie $20,000 for her equity in the house. He agreed the listing price did not guarantee what he would receive if the house sold.

9

¶ 24    Michelle Miskell testified that she was Aubrie's mother and lived in Waterloo, Illinois. She stated that Aubrie lived with her when she left Jesse in July 2021 until August 2022. Aubrie also lived with her in the fall of 2015, for over a year. Michelle watched the children when the parents had military duty. She admitted there was a water accident at her dad's house in which A.S. fell into the lake without a life jacket. She stated that A.S. was not injured. She admitted she did not call Jesse and tell him about the incident.

¶ 25    Aubrie testified that she lived in Dallas while Jesse lived in Tulsa before they were married. She stated that Jesse did not spend a lot of time with N.S. during that time. She eventually moved back with her parents when Jesse said he was in love with someone else. She stated that she had a strong support system with her family and Jesse did not have that type of system. She never had to hire a babysitter. Aubrie stated that Jesse was friends with Danielle Midkiff and N.S. had a fun time with her. Danielle recorded the children and Aubrie heard the recordings. She thought that the recordings were a form of putting the children into the middle of the divorce. She also discussed Jesse FaceTiming the children and crying with the kids about the divorce. Aubrie stated that Jesse stopped calling her after she found the GPS device. She did not talk to Jesse for a couple of weeks or a month after the device was found. Jesse did not see the children at that time, nor did he request to see them. She stated that N.S. knew a lot about the divorce and she did not talk to her about it.

¶ 26    Aubrie identified text messages between her and Jesse that revealed Jesse did not want the divorce and took the blame for Aubrie leaving. Jesse told N.S. that he wanted it to work with Aubrie. The texts also addressed a marital workshop and Aubrie stated it gave N.S. false hope and Jesse should not have mentioned it to her. She stated she only participated in the marital workshop because she was trying to get a property settlement. Aubrie did not believe Stella was trying to put

her son in Gibault and Stella told her that she had driven by Aubrie's house multiple times. When Aubrie told Stella that Jesse cheated on her, Stella was upset and stated that Jesse lied to her.

¶ 27    Aubrie stated she was always the primary caregiver to the children. Jesse did not bottle feed the children or change diapers. He slept in the guest bedroom while she slept in the main bedroom with A.S. She went to the doctor visits. Jesse did not attend A.S.'s developmental appointments or therapies. Aubrie stated that she sent an email to Jesse when the pediatrician left, and Jesse said he would review and get back to her. He did not and two weeks later Aubrie picked a new pediatrician on her own. Aubrie stated the parties also disagreed about religion. N.S. was interested in Catholicism but Jesse did not want N.S. to be Catholic. Aubrie allowed N.S. to attend Catholic school. Disagreements also arose when the children wanted to play soccer. Aubrie asked Jesse about sports, but he was noncommittal. She then signed the kids up, and thereafter, Jesse told her he was looking at other leagues, although he never mentioned the other leagues to her. Aubrie stated that N.S. was in a play the previous year and Jesse only went to one of the four performances. Thereafter, he went to Tulsa to see a woman.

¶ 28    Aubrie stated that the equal summer split (2-2-3) was a disaster because N.S. would come back and blame her for the divorce. She did not want Danielle watching the children. She believed her mother should continue providing care. Aubrie's brother was in prison in Washington State for attempted murder. He was getting out in four or five years, and she did not want her children around her brother. She had not fostered any relationship between the children and her brother. Aubrie continued to have Jesse's iPad and explained that he gave it to her so she could check his emails to ensure he was not cheating. She disputed reading any emails between Jesse and his attorney. She confirmed that she never requested a no-contact or order of protection regarding Jesse. She agreed that she was not paying rent or utilities when she was living with her mother and

11

paid nothing toward the marital residence after she left. She agreed the children caught COVID and she did not inform Jesse of their condition. She did not tell him because she did not want him to harass her. Jesse harassed her at the custody exchanges because he would want to talk about their relationship. She did not inform Jesse when A.S. had diaper rash and agreed that Jesse would contact her when the children had a medical condition, even if minor. If Jesse thought she was talking to someone whom she might date, he would just stand and stare at her while she was talking to that person, whether at church or N.S.'s gymnastics. Jesse specifically asked for Tuesday gymnastics evenings so he could do that and that was why she wanted to take N.S. out of gymnastics.

¶ 29    Aubrie talked to her lawyer about getting orders of protection against Jesse and Stella. She ultimately chose not to pursue them because she did not want Jesse to go to jail or lose his job. Jesse did visit her when she was pregnant with N.S. but stated she only recalled him being there when she was born. She bathed the children every other day, sometimes every third day, depending on the children's activities. She did not think that bathing was good for the natural body oils and believed that too much bathing trained the body to create more oils. She stated that N.S. also had diaper rash. N.S.'s diaper rash was from gluten that she got from her while breastfeeding. Aubrie stated that she usually had a calm demeanor but was not always like that the previous year. She had training on how to remain calm in a bad situation, so she was good at keeping an even keel.

¶ 30    Jeff Kaste testified that he met Jesse at a men's church group and met Aubrie through Jesse. He had known Jesse for 8-10 years and saw him with his children. He stated that Jesse took good care of the children and there were no behavioral issues. Jesse and the children had a loving relationship and Jesse was a hands-on parent. The children trusted and respected Jesse. Jeff agreed that he was friends with both Jesse and Aubrie and that Jesse was pretty sad over the whole divorce

12

situation. Jesse had him try to convince Aubrie to reconcile their marriage. He was aware of Aubrie's address because he helped her move. He disagreed that Jesse had him drive over to see if Aubrie was dating other men. He agreed that Jesse would ask who was at the house when he would return from Aubrie's house after dropping stuff off. He stated he did not spy on Aubrie. He only went by to drop stuff off. He stated that he never heard Jesse say anything negative about Aubrie in front of the children. He tried to help negotiate things between the parties when they could not communicate. He disagreed that he acted as a mediator, saying he talked to them as human beings and as a friend.

¶ 31 Following closing arguments, the court took the matter under advisement. On March 7, 2023, the trial court issued an order "based on the parties' agreement." The order provided for $1600 monthly child support payments and a split of the uncovered medical expenses and tuition, school supplies, extracurricular activities, uniforms, summer camp, and cell phones. The issue of college tuition was reserved. The homes, cars, retirement accounts, and debt remained split as before, with Jesse required to pay $20,000 to Aubrie for the Columbia house in 90 days. Each party would pay their own attorney fees. Jesse was ordered to pay $1000 monthly maintenance for nine months and was credited $700 for past payments.

¶ 32 The court found the following issues required court determination: attorney fees related to the contempt petition, retroactive child support, use of a coparenting app, restrictions on children being around Aubrie's brother, parental responsibilities, and parenting time. The court denied the request for attorney fees and awarded Aubrie five months' worth of child support arrearage from October 2021 to April 8, 2022. Jesse was required to pay $200 a month on the arrearage. The children were not to be left unsupervised with Aubrie's brother. After addressing the applicable statutory factors, the trial court allocated decision-making parental responsibility to Aubrie. After

13

addressing the statutory factors, the trial court provided Aubrie with the majority of the parenting time. Jesse's parenting time during the school year was set as every other weekend from Friday to Sunday and every Tuesday night to Wednesday morning. During the summer months the parties would return to the 2-2-3 parenting time schedule with Jesse having Monday and Tuesday nights, Aubrie having Wednesday and Thursday nights, and the parties rotating Friday through Sunday nights every other weekend. Each party would get the children for eight straight nights in the summer. The parties would split holidays in an odd and even year manner. Jesse timely appealed.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, Jesse contends that the trial court erred in its allocation of (1) parental decision making, (2) parenting time, and (3) child-related expenses. Determining parental responsibility "is a matter within the sound discretion of the trial court." *Sadler v. Pulliam*, 2022 IL App (5th) 220213, ¶ 42. We apply a deferential standard of review because the trial court is in the best position to judge the credibility of the witnesses and determine the best interests of the children. *In re Custody of Sussenbach*, 108 Ill. 2d 489, 499 (1985). In determining parenting time and allocation of decision-making authority, a trial court's decision will not be overturned "unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Sadler*, 2022 IL App (5th) 220213, ¶ 42. A decision is against the manifest weight of the evidence only if there is no basis in the record to support the court's findings. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 177 (2002).

¶ 35                    A. Parental Responsibility: Decision Making

¶ 36    When addressing the parental responsibility of decision making, the trial court considers the relevant factors found in section 602.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/602.5(c) (West 2020). Those factors include:

14

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

15

(14) whether one of the parents is a sex offender \*\*\*; and

(15) any other factor that the court expressly finds to be relevant." *Id.*

¶ 37　On appeal, Jesse does not claim the trial court failed to consider the statutory factors. Instead, he contends the trial court ignored the testimony he provided, and evidence he submitted, as it related to the statutory factors. In support, Jesse cites specific testimony and evidence that was not included in the trial court's order. However, the trial court is not required to specifically address every statutory factor (*Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47), and Jesse fails to cite, and this court is unaware of, any requirement that the trial court must address every piece of evidence submitted or all of the testimony provided during the hearing.

¶ 38　Here, the court's order relies primarily on testimony and evidence provided by Aubrie. Our review of the record reveals that the parties' testimony conflicted in many instances, and the trial court found, in certain circumstances, Aubrie's testimony and evidence was more credible or compelling than that provided by Jesse.

¶ 39　More importantly, at no time does Jesse argue that the trial court's findings were not supported by the record. At most, Jesse only argues that conflicting testimony or inferences could be drawn from the testimony. For example, Jesse argues that in addressing the second statutory factor, *i.e.*, the children's adjustment to their home, school, and community, the court erroneously relied on Jesse's lack of testimony regarding where Jesse planned to move after he sold the marital home. He contends the trial court should have inferred that his decision to sell his house in Columbia, Illinois, was indicative of his plan to move closer to Waterloo, Illinois, based on his past action of moving to Illinois from Texas. Such argument has no merit. Counsel's failure to elicit more specific testimony from his client does not undermine a trial court's findings based on the actual testimony provided.

16

¶ 40 Here, each argument presented by Jesse regarding the statutory factors for parental decision making is rebutted by conflicting evidence or ignores rational inferences based on the nonconflicting evidence. For example, with regard to the third factor addressing the mental and physical health of all the individuals, the evidence revealed that Jesse admitted putting a GPS tracker on Aubrie's car and threatening Aubrie with hiring a private investigator to follow her. The evidence also revealed that Aubrie believed Jesse's friends were enlisted to spy on her by driving by her home or visiting her workplace and the evidence confirmed Stella drove by Aubrie's home and visited Aubrie's workplace. Despite this evidence, Jesse argues there was "no hard evidence" that these actions affected either Aubrie's or the children's mental health. Jesse's argument ignores the rational inference the trial court could have made regarding Jesse's actions on Aubrie's mental health. Moreover, the trial court found the factor favored Aubrie after finding her testimony credible and Jesse's testimony "elusive and not credible."

¶ 41 It is not the function of this court to reweigh the evidence. It is the trial court's responsibility to determine credibility and the needs of the children. *Sussenbach*, 108 Ill. 2d at 499. Where evidence permits multiple reasonable inferences, we will accept those inferences that support the trial court's order. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). Here, upon review of each statutory factor addressed by the trial court, we find sufficient evidence in the record to support the trial court's findings. Accordingly, the trial court's allocation of the decision-making parental responsibility to Aubrie is not against the manifest weight of the evidence.

¶ 42 B. Parental Responsibility: Parenting Time

¶ 43 The trial court allocates parenting time according to the best interests of the child. 750 ILCS 5/602.7(a) (West 2020). In reaching its determination, the trial court considers the relevant factors that include:

17

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities ***;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

18

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender ***;

(16) the terms of a parent's military family-care plan ***; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

¶ 44 A reviewing court will only disturb the circuit court's ruling on parenting time "if it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. Here, after weighing the factors, the trial court awarded the majority of parenting time to Aubrie during the school year and split the summertime equally between the parents.

¶ 45 On appeal, Jesse admits the trial court repeated many of its findings from the decision-making analysis and relies on his decision-making arguments for the similar factors under the parenting time. For the reasons set forth above, we reject those same arguments here.

¶ 46 As to the other factors, Jesse argued, with regard to the first statutory factor, *i.e.*, the wishes of each parent, that it was illogical for the trial court to allow equal parenting during the summer after seeming to rely on Aubrie's testimony. We disagree with Jesse's analysis of the trial court's order. While the court noted Aubrie's testimony that the summer schedule did not go well and the children were unruly upon returning from Jesse's home, the court also noted Jesse's testimony to the contrary that the transitions were fine, and he could follow the split schedule all year long. Notably, the court did not make a credibility finding regarding either Aubrie or Jesse's testimony

19

on this issue. Therefore, it is more likely that the trial court found the testimony of both parents credible, and the children only exhibited behaviors upon their return to Aubrie's home. As such, it can be inferred that the alleged unruly behavior would be less disruptive during the summer as it would not affect the children's schooling.

¶ 47    We further note that the children's behavior upon their return from Jesse's house during the summer break was only one of many issues addressed by the court for this factor. The court also considered the location of N.S.'s current school being in Aubrie's residential area as well as Jesse's harassing behavior, his putting the children in the middle of the divorce, his lack of a support system, and his inability to advise the court where he was moving after the marital home was sold. As the record supports the trial court's finding that this factor was in favor of Aubrie, we will not overturn the trial court's finding for this factor.

¶ 48    Jesse's only other argument was related to the fifth factor involving the interaction and interrelationship of the children with their parents and other persons who may significantly affect the children's best interest. Here, Jesse contends the trial court's finding that the children did "not have a significantly close relationship to anyone associated with Jesse in the area due to his lack of connection in the area" was erroneous because it ignored Jesse's testimony. However, the testimony Jesse cited was about his own support system and provided no information regarding the children's relationship with the people from his church or his friends in the local area. As such, the testimony did not address the issues set forth in the fifth factor.

¶ 49    While Jesse contends the court's finding as to the fifth factor was indicative of the court "punishing him for making that decision [to move from Texas to Illinois] and for moving to be closer to his children," no argument in support of said contention was presented. " 'Mere contentions, without argument or citation to authority, do not merit consideration on appeal.' "

20

*In re Marriage of Sinha*, 2021 IL App (2d) 191129, ¶ 50 (quoting *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12). As such we find this argument forfeited.

¶ 50    Jesse next contends that an award of equal parenting time is appropriate based on the decisions in *In re Marriage of Marcello*, 247 Ill. App. 3d 304, 310 (1993), and *In re Marriage of Perez*, 2015 IL App (3d) 140876, ¶ 32. However, *Marcello* involved a joint custody determination, not a parenting time determination, and was based on a statute repealed on January 1, 2016, that limited awards of joint custody to cases where "the parents *** cooperate effectively and consistently with each other towards the best interest of the child." *Marcello*, 247 Ill. App. 3d at 309. While *Perez* addresses the correct issue, the award of shared parenting time was based on the fact that the parents "were cooperative and could reach shared decisions together in the best interest of" the child and the current shared parenting schedule "was working well." *Perez*, 2015 IL App (3d) 140876, ¶ 33.

¶ 51    Here, the evidence revealed that a shared parenting time schedule was disruptive due to behavioral issues exhibited by the children following exchanges from Jesse's house to Aubrie's house. The evidence also revealed that Aubrie and Jesse disagreed on school choice, religion, physicians for the children, and the extracurricular activities in which the children should participate. Further, while the parties currently lived relatively close, as noted by the trial court, no evidence was submitted as to where Jesse would move following his sale of the marital residence. For these reasons, we find *Marcello* and *Perez* easily distinguishable and the trial court's parenting time schedule was not against the manifest weight of the evidence.

¶ 52                      C. Child-Related Expenses

¶ 53    Finally, Jesse argues that the trial court erred in requiring both parties to contribute equally to child-related expenses including tuition, other school expenses, and extracurricular activities.

21

Section 505(a)(3.6) of the Act provides trial court discretion to "order either or both parents owing a duty of support to the child to contribute to the reasonable school and extracurricular activity expenses incurred which are intended to enhance the educational, athletic, social, or cultural development of the child." 750 ILCS 5/505(a)(3.6) (West 2020). Typically, such decision is reviewed with an abuse of discretion standard. See *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶¶ 30-31. However, here, no such review is necessary due to the invited-error doctrine and forfeiture.

¶ 54    Under the invited-error doctrine, " 'a party cannot complain of error which that party induced the court to make or to which that party consented.' " *In re Marriage of Shulga*, 2019 IL App (1st) 182028, ¶ 29 (quoting *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004)). "The rationale behind this doctrine is that 'it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings.' " *Id.* (quoting *In re Detention of Swope*, 213 Ill. 2d at 217).

¶ 55    Jesse's position statement filed on October 7, 2022, in anticipation of the hearing stated, "Parties should be equally (50/50) responsible for uncovered medical and extracurricular activity expenses." While the pleading requested joint decision making and parenting time responsibility— and referenced a more specific parenting time schedule not found in the record—the request for equal responsibility for the expenses was not limited to, or qualified as, a willingness to pay for extracurricular expenses only if joint decision making and parenting time was awarded. As Jesse's position statement requested an equal division of the extracurricular activity expenses, we decline to address Jesse's argument related thereto pursuant to the invited-error doctrine.

¶ 56    Jesse's argument regarding the equal division of school expenses, including tuition, fares no better. The trial court's handwritten, five-page April 8, 2022, temporary order entered "on a

22

summary basis and the parties otherwise agreeing" specifically stated that the "parties would continue to equally divide tuition *** costs." The temporary order was signed by both parties. While Aubrie's position statement included an equal division of these expenses, Jesse's position statement failed to address the issue.

¶ 57 The record also reveals that after providing a list of stipulations prior to the hearing, Aubrie's counsel advised the court of the only remaining issues for which a court determination was requested. The issues included: retroactive child support, decision-making responsibilities, parenting time excluding holidays, attorney fees related to Aubrie's contempt petition, and whether the children could visit Aubrie's incarcerated brother. Following the recitation of remaining issues, Jesse's counsel did not object or submit school expenses as an additional issue requiring court determination. Nor did Jesse's counsel address the issue during closing arguments.

¶ 58 Despite what appears to be an agreement in the temporary order on this issue and providing no argument to the contrary at the final hearing, on appeal, Jesse argues that the trial court failed to find the school expenses were reasonable before splitting the costs equally. We find this argument has no merit. "It is well settled that issues not raised in the trial court are deemed [forfeited] and may not be raised for the first time on appeal." *Haudrich v. Howmedica, Inc*., 169 Ill. 2d 525, 536 (1996). Accordingly, we affirm the trial court's allocation of school expenses, including tuition.

¶ 59                                III. CONCLUSION

¶ 60 For the reasons stated herein, we affirm the trial court's allocations of parental responsibility for decision making and parenting time as well as its allocation for child-related expenses.

¶ 61 Affirmed.

23