NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250319-U

NO. 4-25-0319

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| HEATHER M. BEAN-OYLER, | ) | Circuit Court of |
|     Petitioner-Appellant, | ) | Peoria County |
|     and | ) | No. 22DN254 |
| ZACHARY M. OYLER, | ) | |
|     Respondent-Appellee. | ) | Honorable |
| | ) | Daniel M. Cordis, |
| | ) | Judge Presiding. |

---

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court reversed and remanded the trial court's judgment of dissolution of marriage between petitioner and respondent, as the court failed to state the amount of maintenance to which petitioner was entitled under the statutory guidelines before deviating from those guidelines, as required by statute.

¶ 2    Petitioner, Heather M. Bean-Oyler, appeals from a judgment of dissolution of her marriage to respondent, Zachary M. Oyler. Heather contends that the trial court abused its discretion by (1) failing to state the amount of maintenance to which she would be entitled under the statutory guidelines before deviating from those guidelines, (2) allocating almost all the marital debt to Zachary in lieu of awarding her maintenance, and (3) awarding the marital home to Zachary instead of selling it and dividing the proceeds. For the reasons that follow, we reverse and remand for the trial court to calculate and specify the amount of maintenance to which Heather would be entitled under the statutory guidelines and reevaluate its determination of maintenance and the

division of property accordingly.

¶ 3                                    I. BACKGROUND

¶ 4         The parties were married on May 12, 2012. On November 8, 2022, Heather filed a petition for dissolution of marriage. In the petition, Heather requested that Zachary pay maintenance to her. She also filed a petition for temporary relief requesting maintenance. Zachary filed a response to the petition for dissolution and temporary relief on August 18, 2023.

¶ 5         On January 2, 2024, the parties filed an agreed temporary maintenance order, requiring Zachary to pay temporary monthly maintenance to Heather in the amount of 33% of his net income, minus 25% of Heather's net income, based upon his income between December 15, 2023, and January 15, 2024.

¶ 6                                    A. Bench Trial

¶ 7         The bench trial began on July 16, 2024, and continued on October 10, 2024, and November 25, 2024. The following evidence was presented.

¶ 8         1. *Zachary and Heather's Marriage, Backgrounds, and Standard of Living*

¶ 9         Heather obtained her real estate license in September 2011 and began working as a realtor immediately thereafter. Heather also earned a master's degree in 2013 after completing a bachelor's degree in management and organizational behavior. She testified that she "did really well with real estate" and "was rookie of the year for the association when [she] first was licensed." Zachary obtained his real estate license in 2016 and then joined Heather's realty practice. Heather was later employed as the chief development officer at Quest Charter Academy between 2019 and 2020.

¶ 10         Elisa Skibinski testified that she was a realtor, was Heather's real estate mentor, and shared an office with Heather for five years. She testified that when Heather worked as a

realtor, Heather "just was not showing up and doing it, not wanting to, not wanting to come to work." She explained Heather's reluctance to work started around 2014. Skibinski stated that Heather and Zachary remodeled and made improvements to their house "[n]o less than 20 [times]." She witnessed Zachary criticizing the amount of money being spent on these projects. Skibinski also testified that Heather received numerous packages of household goods at the office when they shared an office.

¶ 11      During their marriage, the parties were members of three private clubs: the Country Club of Peoria, Creve Coeur Club, and the Ivy Club. Heather had a private trainer throughout the marriage. They also took nice trips, such as a wine-tasting trip to Napa Valley, California, and "a very expensive trip to Disney World." Heather testified that Zachary "regularly bought [her] very nice jewelry" and they went out to eat "really regularly" because their kitchen was under construction for five years. Heather also testified that they "regularly attended high end functions and were donors to a lot of things here in Peoria." She said she and Zachary had box seats at the symphony and were Visionary Society members at the museum. She also had a membership at "Soderstrom Day Spa" (Soderstrom) for "a very long time," which covered "a couple facials a month." They hired someone to mow the lawn, clean their house, and "work on [their] masonry and things like that too." She drove a Mercedes, and Zachary drove a Cadillac.

¶ 12      Heather testified that the last time she "actively helped with a [house] sale" was in March 2020. She explained that she stopped working because "[t]here was a lot of trauma that happened in [their] marriage" after Zachary was arrested for "aggravated domestic violence" in July 2019. He eventually took an "*Alford* plea" to the charges (see *North Carolina v. Alford*, 400 U.S. 25, 37 (1970) (an *Alford* plea is a guilty plea where the defendant maintains his or her innocence)). After her mother died in May 2020, Heather stopped working and transferred all her

real estate listings to Zachary. She attended a residential treatment facility in Florida between May and June 2020 due to "trauma that was surrounding [her] marriage."

¶ 13                                    2. *Employment at the Time of the Trial*

¶ 14         Zachary testified that at the time of the trial, he was employed as a real estate agent and an at-large Peoria City Council member. As of November 16, 2024, he had earned $256,501.03 that year. Prior to that, his most recent gross income (filing taxes as married filing separately) was $189,436 in 2022 and $132,937 in 2023. When he and Heather jointly filed taxes, their gross income was $215,513 in 2021 and $256,928 in 2020.

¶ 15         Heather testified that she was not earning any income at the time of the trial but did have a real estate license and two limited liability corporations to "work within the advocacy that [she had] been working on daily." Her adjusted gross income was $6,147 in 2023.

¶ 16         Heather testified that she maintained her real estate license and paid $295 a month in professional association dues but was not practicing as a realtor. She started a blog and hired someone to "curate" the blog for $600 a month, plus an hourly rate for editing. According to Heather, she had various health conditions that affected her ability to work. She testified that she "panic[ed] when [she] [thought] about going back to work" as a real estate agent and "d[id]n't think [returning to work] would go well." She said that she had not considered working at "Target or McDonald's." She testified that she applied for a job "[s]ometime this year, earlier on in the year," but had not applied to any jobs at least between July and October 2024. She said her only source of income at the time of the trial was the temporary monthly maintenance that Zachary was paying. Between January and August 2024, Zachary had paid her $79,423.19 as temporary maintenance. She added that she also received a payment of $160,000 relating to a wrongful death lawsuit for her mother and that she had about $75,000 of that remaining as of October 2024 after

paying off several debts and paying rent up front for six months. She also testified that she took over the parties' membership at the Country Club of Peoria and went on a cruise the previous year.

¶ 17 Zachary testified that in November 2023, Heather "drained [his] bank account" when she "took her portion plus an extra $5,000 which was [his] portion to pay [his] bills with for the month of November." He also stated that between October and December 2024, Heather had engaged in "significant partnerships at public events," including purchasing "several thousand dollar tables at the Peoria Symphony gala," being "listed as a corporate sponsor with Caterpillar and OSF [Healthcare]," and having a table at "[T]he Angel Ball for OSF [Healthcare]."

¶ 18 3. *Marital Debt*

¶ 19 Zachary testified that he owed back taxes to the Internal Revenue Service (IRS) for several tax years: $30,358.52 for 2018, $21,899.84 for 2019, $46,796.90 for 2021, $47,421.00 for 2022, and $30,007.00 for 2023. He explained that he owed so much in back taxes due to "[b]oth parties having self-employment income, quarterly taxes not being filed, both parties having total access to the finances, and spending way beyond one's means." He indicated that he filed his tax returns for 2022 and 2023 (as married filing separately) the day before the trial began. He also owed back taxes to the State of Illinois: $10,362.34, which had been sent to collections, $7,643.00 for 2022, and $4,965 for 2023. He testified that he agreed to take on all this tax debt in the divorce.

¶ 20 Zachary also testified that he and Heather incurred a lot of credit card debt and transferred this balance from card to card multiple times because "[t]he spending got out of control." He had several other loans, including student loans (approximately $90,000) and personal loans ($7,500). Zachary testified that both parties used their joint accounts during the marriage; he spent "the majority on paying household expenses," while Heather "spent her share shopping and going to Soderstrom and things like that." He stated that he and Heather disagreed on their

spending "[a]lmost daily" during the marriage. He disagreed with her spending decisions regarding a personal trainer, shopping, and going to Soderstrom. He said that "[t]here were times that [he would] come home and $6,000 had been put on a credit card for trunk show clothing." At the time of the trial, the parties had a cumulative credit card debt of approximately $44,800.

¶ 21　　　Zachary acknowledged that he and Heather made generous donations to nonprofits and characterized himself as "a giving person in this community." In 2021, they donated almost $26,000 to local and national nonprofit organizations.

¶ 22　　　Heather testified that she did not know the amount of debt on the parties' credit cards and had not used them since "early on in [their] relationship." She explained that Zachary "handled all [their] finances even before [they] were married" and "filed the taxes," so she "generally didn't see or even sign [her] own name to the taxes when they'd come through." She stated that they often used credit cards early in their marriage, but at some point, she "switched to all debit for a really long time" after she "found out that [Zachary] hadn't been paying the bills." She testified, "[I]t was a lot of shock when I heard about the amount that was—I knew that there was debt. I just had no idea to the extent of it." She stated that she "didn't [understand] for a long time" that she and Zachary were living above their means but did "understand that now." She also testified that she had approximately $95,000 in student loans.

¶ 23　　　On the suggestion of her attorney, Heather filed her taxes for 2022 and 2023 as married filing separately. As of July 2024, she was in the process of filing innocent spouse paperwork with the IRS and the State. Jeff Lichtenberger testified that Heather retained him as a tax consultant for the purpose of filing the innocent spouse claim, which he stated was to "separate liability from a spouse who was impacted by the financial decisions or tax implications of filing either incorrectly or without the knowledge of the spouse in this case." He explained the claim was

limited to the 2021 tax year.

¶ 24                                4. *Marital Assets*

¶ 25          The only marital asset, other than small amounts in checking and savings bank accounts, was the marital home. Zachary testified that he and Heather purchased the home in 2012 for $191,000. Zachary estimated the fair market value of the property to be $225,000. On her financial affidavit, Heather listed the fair market value of the house as $340,000. Neither party had the home appraised. There were two mortgages on the house, totaling approximately $205,000.

¶ 26                       B. Judgment for Dissolution of Marriage

¶ 27          The trial court entered its final judgment for dissolution of marriage on December 9, 2024. The court made specific findings of fact about the division of marital property under section 503 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/503 (West 2024)). As to Heather's employability, the court found that Heather had bachelor's and master's degrees, an active real estate license and a previously successful career in real estate, and a history of employment at Quest Charter Academy and Adams Outdoor Advertising. The court further noted Heather's history of health issues. The court also thoroughly considered each party's contributions to the acquisition and decrease in value of marital property. The court noted that Zachary was the primary breadwinner in recent years. As to the debts the parties incurred during their marriage, the court found:

          "[E]ach party points the finger at the other party. Heather accuses Zachary of racking up crippling income tax debt without her knowing about it, while Zachary accuses Heather of being a spendthrift. Even if the parties' accusations against each other are factually true, they still fall flat. The bottom line is that both parties forged ahead and continued to live well beyond their means. They are both responsible.

Generally speaking, they both knew what was going on with the cost of their lifestyle. And if one party or the other somehow did not know about the growing financial problems, he/she must bear responsibility for turning a blind eye."

¶ 28 As to the marital home, the trial court noted that neither party had the marital residence appraised and their estimates differed, with Zachary estimating the fair market value to be $225,000 and Heather estimating it to be $340,000. The court did not make a finding as to the value of the marital residence. Rather, the court fashioned alternative divisions of marital property using both estimates. The court awarded the residence to Zachary, finding that "regardless of whether the Bigelow Residence is valued at $225,000 or $340,000, Zachary is still being ordered responsible for the vast, vast majority of the parties' net negative marital estate. Under those circumstances, it is not inequitable or inappropriate to award the home to him." The court explained that even if the property was worth $340,000, Zachary would receive "an additional $131,848.05 asset in the form of the equity of the home," which would "increase the value of the net marital estate to [negative] ($174,082.29) for which Zachary would be responsible for $170,118.68." The court noted that if the division was to be equal, Heather would owe Zachary an equalization payment of $140,577.54 or $83,077.53, depending on the value of the property.

¶ 29 The trial court also made specific findings of fact as to the propriety of maintenance using the factors set out in section 504 of the Dissolution Act (750 ILCS 5/504(a)(1)-(14) (West 2024)). The court found that several factors weighed in favor of awarding spousal maintenance to Heather. The court found Zachary had a higher income, while Heather generated very little income, though she recently received a settlement in a wrongful death case, of which she had $75,000 remaining. The court noted that the marriage was not long, but "Zachary became the primary breadwinner of the marriage, while Heather's health issues became more problematic as the

- 8 -

marriage went on." The court then found that Heather was credible in describing her health problems, which created obstacles to being fully employed. The court emphasized that it adopted "a very one-sided division of assets/debts in favor of Heather." The court found that several other factors weighed against an award of maintenance because (1) the standard of living during the marriage was unsustainable and (2) Heather "already has more than adequate education," maintained her realtor's license, and required "a relatively brief period of time" to obtain employment with her qualifications and work history.

¶ 30 The trial court concluded that Heather was entitled to maintenance but that "Zachary's maintenance obligation is satisfied by his temporary maintenance payments that have been made and the unequal division of the net negative marital estate in this case," and thus, it "employ[ed] the concept of property (or debt) in lieu of maintenance." The court found that if the statutory guidelines were applied, the duration of maintenance would be four years and seven months. The court did not make any findings on the amount of maintenance that would be due to Heather under the statutory guidelines. However, the court "opt[ed] not to follow the maintenance guidelines" because (1) Zachary had paid temporary maintenance since January 2024, which could be applied as a credit toward the duration of maintenance; (2) the division of marital property was "tremendously tilted in favor of Heather," as "[e]ven the most generous valuation for the Bigelow Residence results in Zachary being responsible for $170,000 ([approximate]) of the $174,000 ([approximate]) of the net negative marital estate"; and (3) Zachary's income was not predictable and any maintenance would have to be reviewable.

¶ 31 Ultimately, after balancing the factors applicable to the division of marital assets and debts under section 503(d) of the Dissolution Act (750 ILCS 5/503(d) (West 2024)) and the propriety of maintenance under section 504 (750 ILCS 5/504(a)(1)-(14) (West 2024)), the trial

- 9 -

court ordered the following division, including both valuations for the marital property provided by each party:

**Marital Assets**

| | Zachary | Heather |
|---|---|---|
| Bigelow Residence | $225,000 or $340,000 | |
| 2019 Cadillac | $44,747 | |
| 2020 Mercedes | | $33,725 |
| Bank accounts | $1,877.89 | |
| Bank accounts | | $1,373.36 |
| Zachary's Pension | 50% of marital portion according to Qualified Illinois Domestic Relations Order | 50% of marital portion according to Qualified Illinois Domestic Relations Order |
| Heather's 403(b) Account | | $3,911.63 |
| | | |
| Total Assets | $271,624.89 or $386,624.89 | $39,009.99 |

**Marital Debts**

| | Zachary | Heather |
|---|---|---|
| Mortgage on Bigelow Residence | $161,217.69 | |
| Second Mortgage on Bigelow Residence | $46,934.26 | |
| Cadillac Auto Loan | $47,569.68 | |
| Mercedes Auto Loan | | $41,173.60 |
| JP Companies | $18,890.31 | |
| T-H Professional | $2,846.20 | |
| Accelerated Inventory Management | $23,019.47 | |
| Discover Credit Card | $16,472.21 | |
| Radius Global Credit Card | $9,903.78 | |
| ELAN/Associated | $16,635.14 | |
| Personal Loan | $2,500 | |
| Personal Loan | $2,500 | |
| Personal Loan | $2,500 | |
| IRS Back Taxes 2019-2021 | $105,356.49 | |
| Illinois Back Taxes | $10,362.34 | |
| IRS Back Taxes 2022 | $47,421 | |
| Illinois Back Taxes 2022 | $7,643 | |
| IRS Back Taxes 2023 | $30,007 | |
| Illinois Back Taxes 2023 | $4,965 | |
| USAA Credit Card | | $1,000 |
| American Express Credit Card | | $300 |
| Ally Credit Card | | $500 |

| Total Debts | $556,743.57 | $42,973.60 |

**Net Marital Estate**

| | Zachary | Heather |
|---|---|---|
| Total | -$285,118.68 or -$170,118.68 | -$3,963.61 |

¶ 32      On December 20, 2024, Heather filed a motion for reconsideration, which the trial court denied after a hearing on February 28, 2025.

¶ 33      This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35      On appeal, Heather argues the trial court abused its discretion in (1) determining maintenance when it (a) failed to find the amount of maintenance that would have been awarded under the statutory guidelines before deviating from those guidelines and (b) improperly substituted the transfer of debt to Zachary for cash maintenance and (2) awarding the marital residence to Zachary, rather than selling the house and dividing the equity, without an expert valuation. Though Zachary disputes that Heather was entitled to maintenance in the first place, he believes the "net result" of the court's division of marital property, including awarding debt to Zachary in lieu of maintenance to Heather, was not an abuse of discretion.

¶ 36      Under the Dissolution Act, before entering a judgment of dissolution of marriage, the trial court must consider and decide "the maintenance of either spouse and the disposition of property." 750 ILCS 5/401(b) (West 2024). Marital property is defined as "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage." 750 ILCS 5/503(a) (West 2024).

¶ 37      The division of property is governed by section 503 of the Dissolution Act, which establishes that the trial court "shall divide the marital property without regard to marital

misconduct in just proportions." 750 ILCS 5/503(d) (West 2024). In doing so, courts should consider factors such as "each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property," the "value of the property assigned to each spouse," the marriage's duration, the "age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties," and "whether the apportionment is in lieu of or in addition to maintenance," among other factors. 750 ILCS 5/503(d)(1), (3), (4), (8), (10) (West 2024). Critically, "[t]he touchstone of proper and just apportionment is whether it is equitable in nature, which does not require mathematical equality." (Internal quotation marks omitted.) *In re Marriage of Thornley*, 361 Ill. App. 3d 1067, 1071 (2005).

¶ 38       Maintenance, in turn, is governed by section 504 of the Dissolution Act. 750 ILCS 5/504 (West 2024). An award of maintenance "provides the recipient the same standard of living after dissolution as the recipient enjoyed during the marriage." *In re Marriage of Watson*, 2022 IL App (2d) 210137, ¶ 35. When determining whether to award maintenance, the trial court must consider, among other factors, the income and property of each party, the needs of each party, the realistic present and future earning capacity of each party, the standard of living established during the marriage, the duration of the marriage, the age, health, occupation, employability, and needs of each party, as well as "any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2024).

¶ 39       Although the division of property and maintenance are governed by different sections of the Dissolution Act, they are not completely separate concepts. As mentioned above, section 503 instructs the trial court, when dividing the marital property, to consider "whether the apportionment is in lieu of or in addition to maintenance." 750 ILCS 5/503(d)(10) (West 2024).

See *In re Marriage of Lees*, 224 Ill. App. 3d 691, 694 (1992) (recognizing that "the issue of maintenance is interrelated with the distribution of the marital property," though they are "clearly not the same thing").

¶ 40     A trial court's determination of the distribution of marital property and the propriety and amount of maintenance are reviewed for an abuse of discretion. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34; see *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010) ("[A] trial court's determination as to the awarding of maintenance is presumed to be correct" and "lies within the sound discretion of the trial court.") (Internal quotation marks omitted.)). "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 41                              A. Maintenance

¶ 42                    1. *Findings of Fact as to the Duration and Amount of Maintenance*

¶ 43     Heather first argues that the trial court committed reversible error when it failed to set out the proper amount of maintenance under the statutory guidelines before deviating from them. If the court finds that an award of maintenance is proper, the Dissolution Act provides guidelines for the amount and duration of maintenance, though the court may choose to deviate from the guidelines if it sees fit. See 750 ILCS 5/504(b-1) (West 2024). The guidelines establish that maintenance "shall be calculated by taking 33 ⅓ % of the payor's net annual income minus 25% of the payee's net annual income." 750 ILCS 5/504(b-1)(1)(A) (West 2024). If the court deviates from the guidelines, the Dissolution Act establishes that the court "*shall* state in its findings the amount of maintenance (if determinable) or duration that would have been required under the guidelines and the reasoning for any variance from the guidelines." (Emphasis added.)

750 ILCS 5/504(b-2)(2) (West 2024).

¶ 44    Importantly, " 'when the issue is whether the force of the statutory language is mandatory or permissive, then "shall" does usually indicate the legislature intended to impose a mandatory obligation.' " *People v. Ousley*, 235 Ill. 2d 299, 311 (2009) (quoting *People v. Robinson*, 217 Ill. 2d 43, 54 (2005)). Though the word "shall" is not determinative when the mandatory-directory dichotomy is at issue, we need not delve into whether this statute is mandatory or directory, as even a directory statute requires substantial compliance. *Schultz v. Performance Lighting, Inc.*, 2013 IL App (2d) 120405, ¶ 14.

¶ 45    Here, it is clear that the trial court failed to substantially comply with section 504(b-2)(2), as it did not state the amount of maintenance to which Heather would be entitled under the statutory guidelines. While the court noted that Zachary's income was "not predictable," predictability and determinability are not the same. The court acknowledged that "2023 may be a year that is more representative of his income" than other years but failed to use that year's income as a basis to calculate the amount of maintenance pursuant to the guidelines. We note that the parties did not aid the court in determining what the amount of maintenance under the guidelines would be—while they provided a document dump of tax returns between 2020 and 2023, they did not set out guideline calculations. In her written closing argument, Heather merely asserted that Zachary "reported income so far this year of approximately $260,000" and requested maintenance to be set at $8,546.78 per month. (However, this maintenance request was based on the amount of Heather's monthly expenses, rather than Zachary's income, which is not in accordance with the statutory guidelines.) Though Zachary testified to his 2024 gross income to date in November, he did not address his net income after taxes. See 750 ILCS 5/504(b-3.5) (West 2024) (" '[N]et income' has the meaning provided in Section 505 of this Act."); 750 ILCS 5/505(a)(3)(B) (West

2024) (" '[N]et income' means gross income minus either the standardized tax amount *** or the individualized tax amount."). However, the parties did provide their tax returns for 2020 through 2023, setting out their specific and determinable incomes, which the court could and should have used to calculate the amount of maintenance in accordance with the guidelines.

¶ 46     Where a spouse's income is determinable but variable, "using the income average from the past three years [is] an appropriate method for determining available income for maintenance and support." *In re Marriage of S.D.*, 2012 IL App (1st) 101876, ¶ 43. If the trial court was concerned about the variability in Zachary's income, the court could have calculated an average of the parties' net incomes for multiple years, as the court deemed appropriate, to calculate the guideline amount of maintenance. If a court makes findings about the parties' net incomes and the guideline obligations can be calculated easily based on those findings, then a court's failure to specify the guideline obligations in the judgment for dissolution of marriage may not be reversible error. See *In re Marriage of Minear*, 181 Ill. 2d 552, 566 (1998) (holding that the trial court's failure to calculate the amount of support required under the guidelines did not amount to reversible error because "[t]he judgment of dissolution of marriage also contains [the petitioner's] net monthly income from which the *** guideline support figure can easily be calculated"). Here, however, the court did not make any findings about the parties' net incomes, so we have no findings from which to calculate the amount of maintenance dictated by the guidelines.

¶ 47     Because we do not know what the maintenance amount under the guidelines would be, we cannot evaluate whether the trial court acted within its discretion by deviating from the statutory guidelines and awarding most of the marital debt to Zachary in lieu of awarding Heather any maintenance. As this court recently explained:

"It is true that an equitable division of marital property does not require

'mathematical equality.' [Citation]. However, if an imbalance in the division of assets is the reason to depart from the maintenance guidelines, it is important to have some concrete understanding of both the guideline amount and the value of the assets distributed." *In re Marriage of Burns*, 2022 IL App (4th) 210732-U, ¶ 46.

¶ 48 We acknowledge that Zachary argued on appeal that Heather failed to raise this issue in the trial court and has thus forfeited the issue on appeal. *In re Marriage of Kasprzyk*, 2019 IL App (4th) 170838, ¶ 40. However, forfeiture "is a limitation on the parties, not on this court." *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 377 (2008). "When necessary to obtain a just result or to maintain a sound and uniform body of precedent, we may overlook forfeiture and address the merits of the issue." *Holthaus*, 387 Ill. App. 3d at 378. We choose to overlook Heather's forfeiture because the trial court's failure to make a finding of maintenance pursuant to the guidelines prevents us from evaluating whether the court abused its discretion in fashioning the dissolution judgment. Like in *Burns*, we must thus reverse and remand to the trial court to make a specific finding of the amount of maintenance in accordance with the guidelines and reevaluate its ultimate property division and maintenance determination accordingly.

¶ 49 2. *Allocating Debt in Lieu of Maintenance*

¶ 50 Though we reverse and remand for the trial court to make a specific finding as to the amount of maintenance that Heather would be entitled to under the statutory guidelines, we briefly address her remaining arguments, as they raise issues that will likely recur on remand.

¶ 51 Heather argues that the trial court improperly allocated most of the marital debt to Zachary in lieu of awarding her maintenance. She contends that the court should instead have allocated the same amount of debt to Zachary *and* ordered him to pay periodic maintenance. Though Zachary disputes whether Heather was entitled to maintenance in the first place, he

believes the "net result" of the court's division of marital property was not an abuse of discretion.

¶ 52        Though Heather contends that the trial court's decision was an abuse of discretion, the crux of her argument is that awarding debt to the payor in lieu of awarding maintenance to the payee is *never* proper under the Dissolution Act, which is a matter of statutory construction. The "cardinal rule" of statutory construction is "to ascertain and give effect to the legislature's intent." (Internal quotation marks omitted.) *Kasprzyk*, 2019 IL App (4th) 170838, ¶ 27. The "best indication of legislative intent" is "[t]he language of the statute, given its ordinary and plain meaning." *Kasprzyk*, 2019 IL App (4th) 170838, ¶ 27. Where "the language of a statute is clear and unambiguous, we must apply it as written, without resort to aids of statutory construction," and "may not depart from the plain statutory language by reading into a statute exceptions, limitations, or conditions not expressed by the legislature." *In re Marriage of Zamudio*, 2019 IL 124676, ¶ 15. "We review matters of statutory construction *de novo*." *Kasprzyk*, 2019 IL App (4th) 170838, ¶ 27.

¶ 53        A commonsense reading of section 503 leads us to the conclusion that courts may apportion marital debt in lieu of maintenance. See 750 ILCS 5/503(d)(10) (West 2024) (directing the trial court to "divide the marital property *** considering all relevant factors, including *** whether the apportionment is in lieu of or in addition to maintenance"). Marital property, under the statutory definition, includes marital debt. See 750 ILCS 5/503(a) (West 2024). There is no indication in the statute that the legislature intended to exclude marital debt from the marital property that may be apportioned in lieu of maintenance under section 503(d)(10). Though Heather vaguely claims that "[i]t is well established in Illinois case law that the Court cannot mix the two concepts of maintenance and property distribution," she provides no case law to that effect, and her argument is directly contravened by the plain language of section 503(d)(10).

¶ 54　　　　In support of her position, Heather cites *Lees*. However, her reliance on *Lees* is unavailing. In *Lees*, the trial court ordered the husband to pay one-half of the monthly mortgage payment for the marital residence and explained this payment would be "characterized also as maintenance." (Internal quotation marks omitted.) *Lees*, 224 Ill. App. 3d at 693. The Appellate Court, Third District, recognized that "the issue of maintenance is interrelated with the distribution of the marital property," though they are "clearly not the same thing." *Lees*, 224 Ill. App. 3d at 694. The Third District ultimately found that "while it may have been appropriate for the trial court to order [the husband] to pay a portion of the marital debt, it was not appropriate to use maintenance as a vehicle to accomplish it," noting that "maintenance and property distribution are two separate concepts which cannot be interchanged as the trial court has done here." *Lees*, 224 Ill. App. 3d at 694. However, a critical aspect of *Lees* that Heather does not address was that the appellate court's holding rested on the fact that the debt allocation "was not proper as maintenance *where the record shows that the wife's financial condition did not warrant any maintenance*." (Emphasis added.) *Lees*, 224 Ill. App. 3d at 695. Thus, *Lees* stands for the limited proposition that maintenance and property distribution cannot be interchanged when maintenance is not proper. That is clearly not applicable here, where the court explicitly found, after considering all the relevant factors in section 504 of the Dissolution Act, that Heather was entitled to maintenance.

¶ 55　　　　The only other support that Heather provides for her argument is that in other cases where a trial court allocated property in lieu of maintenance, the payee has been awarded additional assets, rather than being awarded fewer debts. See *In re Marriage of Celani*, 2021 IL App (1st) 201085-U, ¶ 11 (trial court granted to the wife her full retirement plan "in lieu of maintenance"). Heather contends that granting assets in lieu of maintenance "makes logical sense" so that the "receiving spouse gets their money up front." She notably overlooks the fact that the division of

property in *Celani* also involved granting the husband most of the marital debt and declining to award additional maintenance. See *Celani*, 2021 IL App (1st) 201085-U, ¶¶ 23, 26-28. However, merely because additional assets have been awarded in lieu of maintenance in other cases and doing so may make more logical sense under some circumstances, that does not mean that fewer debts can never be awarded in lieu of maintenance under section 503(d)(10).

¶ 56    In fact, there are some Illinois cases where one spouse was ordered to pay a debt in lieu of maintenance, but they are largely in the context of bankruptcy proceedings where courts found the debts were not dischargeable because they were in the nature of support. See *In re Marriage of Rowden*, 163 Ill. App. 3d 869, 872 (1987) ("[T]he order that the husband assume the car loan payments was in the nature of a property settlement in lieu of maintenance."); *In re Marriage of LaShelle*, 213 Ill. App. 3d 730, 734 (1991) ("[R]espondent's assumption of the second mortgage debt was not part of the property settlement but rather in lieu of maintenance and child support."); *In re Marriage of Underwood*, 314 Ill. App. 3d 325, 329 (2000) ("Simply because the amount of maintenance was tied to the amount of marital debt [the husband] placed on [the wife] does not render the award of maintenance an abuse of discretion."); see also *In re Marriage of Merreighn*, 2020 IL App (4th) 190400-U, ¶¶ 10, 12 (finding that the trial court did not abuse its discretion by reducing the wife's annual maintenance from $16,850 to $8,400 in light of the husband being awarded 53% of the marital assets but 79% of the marital debt); *In re Marriage of Mellen*, 2012 IL App (2d) 110854-U, ¶ 28 (finding that the trial court did not abuse its discretion by denying respondent maintenance where he "was awarded essentially all of the marital assets and that petitioner was allocated essentially all of the marital debt").

¶ 57    Ultimately, contrary to what Heather argues on appeal, a trial court can allocate marital debt to the payor in lieu of awarding maintenance to the payee. However, because the trial

court here failed to make a specific finding as to the amount of maintenance to which Heather would be entitled under the statutory guidelines prior to deviating from them, as discussed above, we cannot determine whether the court acted within its discretion by awarding *no* maintenance to Heather in exchange for awarding almost all the marital debt to Zachary. On remand, the trial court must reevaluate its division of property in light of the specific amount of guideline maintenance to which Heather would usually be entitled under the Dissolution Act.

¶ 58                              B. Marital Residence

¶ 59        Heather next argues that the trial court erred in awarding the marital residence to Zachary without an official appraisal of the residence's value, rather than ordering the sale of the residence and equally dividing the equity. Zachary disagrees.

¶ 60        Section 503(d) of the Dissolution Act directs trial courts to "divide the marital property *** in just proportions." 750 ILCS 5/503(d) (West 2024). While making "specific findings as to the value of large assets, such as real estate," is "generally helpful," courts are "not required to value every asset." *Hamilton*, 2019 IL App (5th) 170295, ¶ 35; see *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 651 (2009) ("The [Dissolution Act] does not require the court to place a specific value on each item of property."). However, the Illinois Supreme Court has suggested that "[i]n order to divide the marital property in just proportions, the circuit court first must establish the value of the assets." *In re Marriage of Schneider*, 214 Ill. 2d 152, 171 (2005).

¶ 61        A piece of marital property can only be assigned a specific value if there was "competent evidence of its value presented." *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 29. In general, "a court's determination of the value of an asset 'cannot be based on testimony that is not supported by a proper foundation.'" *Hamilton*, 2019 IL App (5th) 170295, ¶ 39 (quoting *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 56). A proper foundation

- 20 -

requires expert testimony based on "an inspection of the actual condition and interior features" of the property. *Hamilton*, 2019 IL App (5th) 170295, ¶ 39; but see *In re Marriage of Woolsey*, 85 Ill. App. 3d 636, 637 (1980) (affirming the trial court's division of property in the absence of an official appraisal where both parties testified to the same value of the property). "Any conflicts in testimony concerning the valuation of assets must be resolved by the trier of fact." *Schneider*, 214 Ill. 2d at 171. Determining an asset's value "is a question of fact, and the trial court's determination will not be disturbed absent an abuse of discretion." *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 29.

¶ 62        Where "a party does not offer evidence of an asset's value, the party cannot complain as to the disposition of that asset by the court," as "[p]arties should not be allowed to benefit on review from their failure to introduce evidence at trial." *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 29. If a party "has had a sufficient opportunity to introduce evidence but offers none, that party should not benefit on review from its omission. Otherwise, remanding 'would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing.' " *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 30 (quoting *In re Marriage of Smith*, 114 Ill. App. 3d 47, 54-55 (1983)); see *In re Marriage of Deem*, 123 Ill. App. 3d 1019, 1023 (1984); *Hamilton*, 2019 IL App (5th) 170295, ¶ 45; *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶¶ 64-65 (collecting cases).

¶ 63        It is true that in *Hamilton*, the Appellate Court, Fifth District, affirmed the trial court's order to sell properties where "the court was unable to accurately value the two properties at issue due to the parties' failure to present competent evidence of their value," as "[w]ithout such evidence, ordering the properties sold and the proceeds split was the only realistic way to divide the parties' assets in an equitable manner." *Hamilton*, 2019 IL App (5th) 170295, ¶ 45. However, in that case, the scenario was flipped: neither party had the property officially appraised, the wife

wanted the house to be awarded to her, the court ultimately ordered the house to be sold because there was no competent evidence as to its value, and the wife, on appeal, argued that determination was an abuse of discretion. *Hamilton*, 2019 IL App (5th) 170295, ¶¶ 39-44. The appellate court, in finding there was no abuse of discretion, noted that the court was unable to accurately value the property because the parties failed to present the requisite evidence of the property value and could not "be allowed to benefit on appeal from their own failure to introduce competent evidence of value at trial." *Hamilton*, 2019 IL App (5th) 170295, ¶ 45.

¶ 64          Here, the parties offered their own valuations of the home but did not provide any foundation or rationale for their estimates. Zachary estimated the house to have a fair market value of $225,000, while Heather estimated it to be $340,000. Neither party conducted an official appraisal of the property. In the trial court, Heather requested the house to be sold and all the proceeds to be awarded to her, while Zachary wanted the house to be awarded to him. The court made no finding as to whether one valuation was more credible than the other and ultimately found that the $115,000 difference between the two valuations would somehow not affect its ultimate division of property. Now, on appeal, Heather uses the conflicting valuations of the house and the fact that "[n]either party presented any expert testimony or obtained an appraisal of the property" to argue that the court erred in awarding Zachary the property instead of selling it. However, Heather had every opportunity to obtain an appraisal of the property during the two-year-long divorce proceedings and chose not to. Because she and Zachary did not provide the court with competent evidence of the property's value, she cannot now argue that the court should have valued it. See *Hluska*, 2011 IL App (1st) 092636, ¶ 65 ("[W]e cannot say that the trial court abused its discretion in distributing the martial [*sic*] property in 'just proportions' without placing a specific value of [a property and ownership interests in businesses] when neither party presented

any evidence of their value to the trial court.").

¶ 65          However, in light of the fact that the case is to be remanded for the trial court to make a specific finding as to the amount of maintenance to which Heather would be entitled under the statutory guidelines, the court may choose to (1) allow the parties another opportunity to provide competent evidence of the value of the marital residence, (2) sell the property and divide the proceeds equitably instead, as both parties were willing to sell the house, or (3) reevaluate and possibly modify its order to ensure the property is divided in just proportions, considering the exact amount of maintenance pursuant to the guidelines.

¶ 66                            III. CONCLUSION

¶ 67          For the reasons stated, we reverse the trial court's judgment and remand for the court to make specific findings as to the amount of maintenance to which Heather would be entitled under the statutory guidelines and to reevaluate its determination of maintenance and the division of marital assets and debts accordingly.

¶ 68          Reversed and remanded with directions.